# BARBARA YOUNG *vs.* THE COLLEGE OF PHYSICIANS AND SURGEONS AND OTHERS.

*Coroners—Inquests—Making Autopsy Without Consent of Family of Deceased—Evidence.*

Under the local law of Baltimore City, the coroners have power to hold inquests and order autopsies to be made, when, in their judgment, an autopsy is an appropriate means of ascertaining the cause of a person's death.

And in such case a coroner may lawfully order an autopsy to be made without the consent of the family of the deceased.

A physician who makes a *post-mortem* examination in the usual manner and in pursuance of the authority of the coroner, is not liable in an action to the family of the deceased for the mutilation of his body without their consent.

A man in vigorous health, whose leg was crushed below the knee in a railroad accident, was carried to a hospital managed · by one of the defendants, where he died the next day.   The coroner was notified, and considering that the accident was not of itself sufficient to cause death, he ordered a *post-mortem* examination to be made.   This was accordingly performed by the defendant K., but without the knowledge of the family of the deceased.   In an action by the widow of the deceased against the coroner and K. and the hospital authorities to recover damages for the mutilation of the corpse without her consent, *Held,*

1st. That since the coroner had authority to order autopsies to be made, and there was no evidence to show that in directing this one to be made he acted maliciously or corruptly, the plaintiff was not entitled to recover against him.

2nd. That K. was likewise not liable if he performed the *post-mortem* by order of the coroner, and did so without wantonly mutilating the corpse.

3rd. That the hospital authorities having no further connection with the matter than to allow their rooms to be used, they were not liable.

4th. That the evidence of an undertaker to show the effect ordinarily produced on a dead body by a *post-mortem* was admissible.

Appeal from the Court of Common Pleas.   The instructions given to the jury are set forth in the opinion of the Court.   At the trial, the plaintiff offered the following prayers which the Court below (PHELPS, J.), rejected:

*Plaintiff's 1st Prayer.*—The plaintiff prays the Court to exclude from the consideration of the jury all of the evidence of Dr. Edwin Geer and Dr. N. G. Kierle, in so far as the same tends to show that the said Keirle acted in holding the alleged *post-mortem* examination by order of the said Geer, coroner, and in so far as the testimony of the said Geer tends to show that in ordering the alleged *post-mortem* examination he did so by virtue of his official position as coroner, there being no competent evidence of an inquest held over the body of the deceased.

*Plaintiff's 2nd Prayer.*—That no legally sufficient evidence has been produced and offered to the jury by the defendants in this case of any proceedings by or before the coroner from which they can infer or find that the body of the plaintiff's husband had been lawfully delivered or turned over to said defendants to be dealt with in the manner testified to by the plaintiff's witnesses in this case.

*Plaintiff's 3rd Prayer.*—If the jury believe from the evidence that on or about March 16th, 1893, the plaintiff's husband had his right leg crushed off in a railroad accident while coupling cars in Baltimore City, and that thereafter he was taken to the City Hospital for medical treatment, and that he died from the effects of the injury so received in said hospital on the following day, and shall further find from the evidence that his body, after so dying, was removed to the dissecting room of the College of Physicians and Surgeons, one of the defendants, and was there dissected, cut and mutilated by the members or a member of the faculty of the defendant corporation, or any one claiming to act in such capacity with the knowledge and assent of the defendant corporation, then the plaintiff is entitled to recover in this action, unless the jury further find that the defendants had previously obtained the consent of the plaintiff for such purpose, and the jury, in making up their verdict, are at liberty to take into consideration and estimation the mental pain and anguish and lacerated feelings resulted to the plaintiff from the mutilation of the remains of her deceased husband and privation of the body for the purpose of decent interment.

The cause was argued before ROBINSON, C. J., BRYAN, MCSHERRY, FOWLER, BRISCOE, ROBERTS and BOYD, JJ.

*R. B. Tippett* and *Andrew H. Mettee*, for the appellant.

*Edwin G. Baetjer* (with whom were *Richard M. Venable, E. N. Rich* and *William S. Bryan, Jr.*; on the brief; the

Court declining to hear other counsel than *Mr. Baetjer*), for the appellees.

ROBERTS, J., delivered the opinion of the Court.

The plaintiff below (who is now appellant), brought suit against the College of Physicians and Surgeons of Baltimore City, Dr. Nathaniel G. Keirle and Dr. Edwin Geer. In her declaration she averred that the body of her deceased husband was wrongfully and unlawfully taken in charge by the defendants, and cut and mutilated and used as a subject for the students of the defendant college without warrant in law; and that the defendants wrongfully and unlawfully detained the dead body from burial, when demanded for that purpose by the plaintiff; and that the cutting and mutilation of the body was done secretly and clandestinely, in order to afford instruction to the students of the college, and without the consent of plaintiff or anyone acting for her. The damage alleged to have been caused by these acts was great mental excitement and distress and bodily suffering on the part of the plaintff. Demurrers by each of the defendants presented to the Court below the question whether the facts alleged entitled the plaintiff to a cause of action. The Court overruled the demurrers, and the case was tried before a jury. The verdict and judgment were in favor of the defendants, and the plaintiff appealed.

Of course, even if errors were committed by the Court in the course of the trial, we could not reverse the judgment, if it were manifest to us that the declaration showed no right of recovery on the part of the plaintiff. We shall not, however, further advert to this matter at present. But inasmuch as the acts laid to the charge of the defendants impute grave moral delinquency, it seems to us just that we should in the first instance carefully examine the grounds on which these accusations are made. The deceased, George W. Young, while engaged in coupling cars on the Northern Central Railroad, sustained a very severe injury; his right leg was mashed below the knee, and the

injured portion almost severed from his body, retaining its
connection with it only by a few threads of tissue. The
wounded man was a strong stout man, of good nerve and
able to work. His widow testified that he never lost any
time from his work; and one of his fellow laborers testified
that he had worked with him five years, and that he lost no
time. He was sent to the City Hospital in Baltimore,
where he died the next day. The College of Physicians
and Surgeons supplies the medical and surgical service to
the City Hospital, and the patient was under the care of a
resident physician, who was appointed by the college.
After his death a *post-mortem* examination was ordered by
Dr. Geer, one of the defendants, and was conducted by Dr.
Keirle, another of the defendants. The *post-mortem* was
made in a room belonging to the College of Physicians and
Surgeons, where such examinations are usually made; and
the two physicians just named are connected with the col-
lege; Dr. Keirle being a member of the faculty. The *post-
mortem* was without the consent of the plaintiff, the widow of
the deceased, or of any member of his family. Evidence was
offered on the part of the plaintiff for the purpose of showing
that the body was wantonly cut, mutilated and disfigured, and
the feelings of the relatives of the deceased inhumanly out-
raged. On the part of the defendants it was shown that
Dr. Geer was one of the coroners of the city of Baltimore,
and that Dr. Keirle was the medical examiner appointed by
the board of health ; also that the *post-mortem* was ordered
by Dr. Geer as coroner, and performed in obedience to his
orders by Dr. Keirle. Dr. Geer testified that he ordered
the autopsy because he wished to know the cause of death ;
that it had been reported to him that the man's leg had
been cut off by the train, and that he had died within thirty-
six hours after he was brought to the hospital ; and that he
did not think that the loss of the leg in this way sufficiently
accounted for the death ; and that he could not give the
death certificate without having a *post-mortem*. Dr. Keirle
testified that he did not think that in the majority of cases

persons in ordinary health, when the leg was crushed below the knee, would die from shock. Dr. Welsh testified that if a healthy man should have his leg crushed off, he would not think it a sufficient cause to explain the death, and in such case, if his official duty required him to give a death certificate, he would make every effort to obtain a *post-mortem;* and that it was so unusual for a death to occur from accident under the conditions surrounding the deceased that other explanations were more probable. Dr. Michael testified that when a man's leg is cut off below the knee, and he dies within thirty-six hours after the injury, the accident would not be an entirely satisfactory explanation of the death, if the man was ordinarily healthy and mnscular ; and if he was required to determine definitely the cause of death in such a case, he would not consider that he had done his duty without having an autopsy. Dr. Keirle described his proceeding in making the autopsy ; the taking out the brain, the opening the body, the removing and cutting into the different organs, the liver, spleen, kidneys, lungs and heart. He testified that you have to examine all the vital organs to see the cause of death, and that the cause of death was persistent heart shock ; that the deceased had fatty kidneys, and fatty degeneration of the heart ; that the injury itself was not of such a nature as should have caused persistent heart shock, unless there was something else besides the injury which helped to produce it ; that the crushing of a man's leg below the knee was not such a thing, in his opinion, as would produce persistent heart shocks. Dr. Welsh and Dr. Michael testify that to make a complete examination it is necessary to remove and open the brain. Without going into minute details, we may say that the professional testimony in this case tends to show that the autopsy was conducted in the usual manner.

By the Act of 1878, chapter 347, the Governor is authorized to appoint four coroners for the city of Baltimore. This Act is codified among the Public Local Laws as Article 4, sections 149, &c. Inquests are required to be held

whenever a person is found dead and the manner and cause of death shall not be already known as accidental or in the course of nature.   There are other duties which coroners in the city of Baltimore are required to perform.   The municipality has the power to pass ordinances to preserve the health of the city, and to prevent the introduction of contagious diseases therein.   In pursuance of this power a board of health has been established, and many ordinances have been passed for the purpose of detecting and preventing the causes of diseases and removing them when they are found to exist.   The board of health is authorized and required to appoint a medical examiner, and it is made his duty to make *post-mortem* examinations in any part of the city when called upon by either of the coroners or the board of health.   Baltimore City Code of 1892, Article 23, sections 1, &c. ; 6 and 7.   Furthermore it is enacted, that "when any person shall die in the said city, it shall be the duty of the physician who attended during his or her last illness, or the coroner when the case comes under his notice, to furnish within forty-eight hours after the death * * a certificate setting forth as far as the same can be ascertained * * the cause, date and place of death." City Code of 1892, Art. 42, section 2.   The object of this last provision is obvious.   The spread of infectious and contagious diseases is very apt to occur in thickly settled communities.   It is therefore the part of wisdom to watch with vigilance every indication of· their approach, and to investigate the causes which might in any probability produce them.   The causes of death must be ascertained, so that means may be adopted for the prevention of other deaths from the same sources.   The evidence before us exhibits the case of a public officer whose duty it is to find out and certify the cause of a death which is brought to his notice.   The accident preceding his death, and disabling him, is not in his opinion .sufficient to cause the death of a healthy person.   There must, therefore, as he thinks, be some diseased condition of the injured man, which con-

tributed to bring about this result.    His opinion is shared by other reputable physicians who have testified in the case. He could not honestly and conscientiously give the certificate which the law required him to give, unless he made proper inquiry into the case.    In his judgment and in the judgment of the professional witnesses proper and sufficient inquiry could not be made without an autopsy.    So far as the evidence in the case shows, or any rational inference from it, the coroner did simply his plain and positive duty in ordering the autopsy.    And the medical examiner, Dr. Keirle, was equally obliged by his duty to obey the order of the coroner.    On the prayer of the defendants the Court gave to the jury the three following instructions:

1. There is no evidence in this case to show that the College of Physicians and Surgeons did any of the alleged wrongful acts mentioned in the declaration or ratified the same, and therefore their verdict must be for the said defendant, the College of Physicians and Surgeons of Baltimore City.

2. That there is no evidence legally sufficient to show that the defendant, Geer, participated in any way in the commission of the alleged wrongful acts mentioned in the declaration, further than as coroner of the State of Maryland, to order the *post-mortem* examination to be performed, and that there is no evidence legally sufficient to show that in ordering the *post-mortem* examination to be performed, he acted wantonly, maliciously or corruptly, and therefore the verdict must be for this said defendant, Edwin Geer.

3. If the jury believed that the defendant, Keirle, performed the *post-mortem* upon the body of George W. Young, deceased, at the order of Coroner Geer, as the city examining physician, and that in performing said *post-mortem* he treated the body with ordinary decency and did not wantonly disfigure the same, he acted within the scope of his official duty and the verdict must be for the defendant, Keirle.

The College of Physicians and Surgeons permitted their

room to be used for the *post-mortem* examination, but appears to have had no further connection with the matter. The *post-mortem* was a lawful proceeding. If anything irregular or improper occurred in the prosecution of it, the College took no part in it. The same thing may be said in reference to the coroner. The question regarding the charges which alleged the wanton mutilation of the body was fairly left to the jury in the last instruction. The prayers offered on the part of the plaintiff were inconsistent with those granted by the Court, and were properly rejected. As the jury have acquitted the defendants of the charges made against them, it would seem to be rather an abstract question to consider what would have been their responsibility in a civil action if they had been found guilty. It is to be hoped that few persons in a civilized country would wantonly mutilate a dead body, or would without warrant of law attempt to prevent surviving friends and relatives from performing the rites of Christian sepulture. Such acts would manifest a great depth of depravity.

Two exceptions were taken to the admission of testimony given by Mitchell, a funeral director. He was asked, "Did you ever have, in your professional capacity, anything to do with the preparing for burial persons upon whom *post-mortem* examinations had been made?" to which he replied, that he had. He was then asked, "When the body is turned over to the funeral director for burial, is it or is it not, after a *post-mortem* has been performed on it, fit to be seen by the family without shocking their sensibility?" to which he replied, "I never received a body from the hands of the coroner or where a *post-mortem* examination had been made, that was in a condition for the family to see without being prepared." The testimony showed the effect produced on a dead body by a *post-mortem* examination. We cannot see any objection to proving this fact; it might almost be inferred from common knowledge that the use of the surgeon's knife would disfigure the human body and give it an

appearance which would shock the sensibilities of the family of the deceased    The judgment must be affirmed.

*Judgment affirmed.*

(Decided June 18th, 1895.)