CATHERINE McENTEE ET AL., APPELLANTS, V. THOMAS BONACUM ET AL., APPELLEES.

FILED DECEMBER 3, 1902.   No. 12,277.

Commissioner's opinion, Department No. 3.

1. **Final Place of Burial:** RIGHT OF NEXT OF KIN: UNMARRIED PERSON: WAIVER: RELINQUISHMENT: CLEAR EVIDENCE. Ordinarily the right to the custody and to decide upon the final place of burial of the body of a deceased unmarried person resides in his next of kin, and this right the courts will not lightly disregard, or treat as having been waived or relinquished, except upon clear and satisfactory evidence of conduct indicative of a free and voluntary intent and purpose to that end.

2. **Evidence.** Evidence examined, and *held* not to **be** sufficient **to** bring this case within the above-mentioned exception.

3. **Parish:** TERRITORIAL AREA: NOMENCLATURE OF ROMAN CATHOLIC CHURCH: CORPORATE ENTITY: RIGHT OF CHURCH TO LEGISLATE. Territorial areas, described in the nomenclature of the Roman Catholic church as "parishes," are not recognized by the law as corporate or political entities, and if they were such, the church could not legislate concerning them.

APPEAL from the district court for Lancaster county. Proceedings in equity to perpetually enjoin the defendants

[*] A contrary rule, however, prevails in Indiana.

from interfering with the removal of a dead body from Mount Calvary Cemetery. Heard below before CORNISH, J. Judgment for defendants, and plaintiffs appeal. *Reversed.*

*Charles O. Whedon,* for appellants.

*Andrew J. Sawyer* and *Novia Z. Snell, contra.*

AMES, C.

At the times hereinafter mentioned Mount Calvary Cemetery was a tract of land in the vicinity of the city of Lincoln, in this state, set apart as a burial place for the communicants of the Roman Catholic church and their relatives, the legal title to the tract being in the defendant, the Rev. Thomas Bonacum, as bishop of the diocese, and previously in his predecessor in office. Edward P. Cagney, now deceased, was the son of the plaintiff Catherine Mc-Entee by a former husband, and the brother of the plaintiff Marista Cagney, and a half-brother to David C. McEntee, son of Catherine. So far as appears from the record, the plaintiffs are the only relatives by blood of the deceased who were living at the time of the beginning of this action. Edward's father died when he was a child, and at about the age of nine or ten years he was taken into the family of his mother's brother, John Fitzgerald, by whom he was nurtured and educated and by whom he was provided with employment after he had attained to sufficient maturity. From the beginning he made his home continuously and exclusively with his uncle, who, and whose family, appear to have regarded him with a warm affection, which was fully reciprocated; but there was never any estrangement between him and the plaintiffs or any of them. He died at the home of his uncle in Lincoln in the month of April, 1891, and was buried in the above-mentioned cemetery in a plot of ground which, by some means or procedure, not described in the record, had been assigned or allotted for the use as a burial place of the uncle and his relatives. A

few years later the uncle also died and was buried in the same plot; his widow, the defendant Mary Fitzgerald, being appointed as the sole administratrix of his estate. She was not related to the deceased otherwise than by her marriage to his uncle, and as to what right or authority, if any, over this parcel of land or over the subject of this litigation, her appointment conferred upon her, the record and briefs of counsel are silent. The defendant Walton G. Roberts is an undertaker, and is described as a trustee of the cemetery, but what were his powers or duties as such, or what were his official relations, if any, to the church or to the land, the legal title to which was, as we have said, in the bishop, we are not informed. The property is described in one of the so-called "statutes" of the diocese as belonging to the parish in which it is situated, though it certainly does not so belong, in a legal sense—first, because its title is vested elsewhere; and second, because the law does not recognize any such territorial subdivision or legal entity as a parish, and concerning such political corporations as the state does contain the church does not possess any power of legislation. Until further advised, we shall feel obliged to say that the defendant Roberts appears to have no title or interest, personal or otherwise, in the controversy. During all these times the plaintiff Catherine McEntee and her children, Marista and David C., were living and they now live, at the city of Plattsmouth, in this state, where they have burial rights in a Catholic cemetery, in which one of her sons is now buried and where she, being very old, anticipates that before very long she will herself be also interred. Animated by a desire that ultimately her family should, as far as possible, be brought together at this final resting place, she applied in May, 1901, to the defendants Roberts, Fitzgerald and Bonacum for permission to remove the body of her son from the cemetery at Lincoln to that at Plattsmouth. The request was denied by each of the defendants, and upon repairing to the Lincoln burial-ground with vehicles and apparatus requisite to carry out the object she had in view, she was met at the

entrance by a person in charge of the premises, who threatened her with prosecution if she should not desist. Thereupon she and her two children began this action to perpetually enjoin the defendants, and each of them, from preventing her carrying out her aforesaid desires or from obstructing her in so doing. On the trial the bishop testified, in substance, that he had no interest or inclination in the matter except in so far as he deemed it to be his official duty to protect the rights and maintain the status of persons to whom burial privileges in the cemetery had been allotted. The pleadings are not divergent in any essential degree as to any of the above-recited facts, which, except as below stated, are all that we think material in the present inquiry. The defensive matter stated in the answer is that Edward P. Cagney, "long prior to his death, had expressed a wish that his remains be interred in the family burying-ground of said John Fitzgerald and had selected for that purpose, by and with the consent of the said John Fitzgerald and Mary Fitzgerald," the plot where he was in fact buried, "and it was his dying wish that his former request in that behalf should be carried out." It is further alleged that after his decease the said John and Mary, "in pursuance of said wish and without any opposition or remonstrances whatever on the behalf of the plaintiffs or any of them or anyone else," caused his body to be buried at the spot designated. That a dying request by a decedent as to the disposition of his remains is obligatory upon his next of kin, we very much doubt. Probably if, in this case, such a request had consigned the body to a dissecting table, all the parties to this action would have unanimously repudiated it as an obligation upon the living. But we need not decide the question at this time because the answer does not allege such request. It alleges a wish as consequent upon a request made "long prior," but it is not alleged that the wish was expressed by word or gesture, and so far as appears from the pleading it may have been a mere inference from the precedent request. It appears from the evidence that the request referred to was made

some eleven years before the death of Edward, who died unmarried, at about the age of twenty-one years, so that, at the time he made it, he was a child of nine or ten years of age, who had been living with his uncle something more than a year. This request was made of the Fitzgeralds alone, and if it was repeated,—about which there is some doubt,—it was repeated to them alone. It did not come to the knowledge of the plaintiffs or of any of them until after Edward had died. This falls far short of being a dying request, or of proving a dying wish. The allegation that the burial was "without the opposition or remonstrance" of the plaintiffs is, we think, immaterial. The great weight, if not the unanimous voice, of the authorities is that the right of disposition of the body of a deceased person resides in his or her surviving consort or next of kin, and we think this court would be unwarranted in holding that such right can be relinquished, if at all, without some affirmative act evidencing a deliberate purpose so to do. That the plaintiffs or any of them ever committed such an act, is not only not alleged, but is not proved. What the evidence does establish quite clearly, and all that it tends to establish, is that when the body was lying in wait for the grave a discussion arose about the place of sepulture, the plaintiffs then expressing a desire that it should be at Plattsmouth, and that, after having been repeatedly besieged by the Fitzgeralds and by a priest of the church, they reluctantly ceased, for the time being, their active opposition to the burial which took place. But that they ever freely and voluntarily consented to it, there is not a syllable of evidence to prove. We do not think that this is a case to which the doctrine of estoppel applies, but if it was, the evidence would be insufficient to maintain the issue on behalf of the defense. The right of a surviving husband or wife, or, if there be none, of the next of kin, to have the custody of the body of a deceased person and decide upon the place of its final burial, is supported by the better reason and by the almost unanimous voice of the authorities. There are, of course, exceptions, as there are to

McEntee v. Bonacum.

nearly all general rules; but they arise, for the most part, out of some such circumstances as would deprive a natural guardian of the custody of a living child. The sentiments, sympathies and affectionate wishes of parents and near relatives concerning their deceased children and next of kin are not to be lightly set aside at the instance of strangers to the blood, or of distant relatives. *Weld v. Walker,** 130 Mass., 422; *Wynkoop v. Wynkoop*, 42 Pa., 293, 82 Am. Dec., 506; *Snyder v. Snyder*, 60 How. Pr. [N. Y.], 368, 371; *In re Beekman Street*, 4 Brad. [N. Y.], 507; *O'Donnell v. Slack*,† 123 Cal., 285; *Smiley v. Bartlett*, 6 Ohio C. C., 234.

We do not think that the record in this case offers any occasion for an exception. The district court dismissed the plaintiffs' petition and granted a perpetual injunction in behalf of the defendants. The plaintiffs appeal.

We recommend that the judgment of the district court be reversed, and that a judgment be rendered in this court according with the prayer of the petition.

DUFFIE and ALBERT, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, it is ordered that the judgment of the district court be reversed, and that a judgment be rendered in this court according with the prayer of the petition.

REVERSED.

NOTE.—*Property Rights in Burial Lot.—Dead Body Part of Realty.— Egyptian Custom.* On the 18th day of November, 1869, Joseph Guibord died at Montreal with the civil status of a Roman Catholic. But the deceased was refused Catholic burial and even interment, except in the potter's field, for the reason that, at the time of his death, he was a member of the Canadian Institute, a literary society whose members had been excommunicated by Bishop Bourget of Montreal, because forbidden books were kept in their library. At the death of Guibord an appeal to the Pope was pending. On the 20th of November, a request was made for burial of the deceased, at the instance of his widow, who offered to accept

*39 Am. Rep., 465.
†55 Pac. Rep., 906, 43 L. R. A., 388.

burial without religious ceremony. On the following Sunday—November 21—the body was taken to the cemetery, and the usual fees tendered to the clerk of the *fabrique.* Upon a second refusal, mandamus was invoked. It was held, both on trial and upon appeal to the Privy Council, that the civil court had jurisdiction to inquire whether the refusal complained of was in accord with the law and discipline of the Roman Catholic church; that Guibord never having been excommunicated *nominatim,* and never having been adjudged or proved *"un pecheuc publique"* within the ritualistic meaning, was not under any such censure as would justify the denial of ecclesiastical sepulture to his remains. As to whether, in a suit properly framed, the court had jurisdiction to order the performance of the usual religious rites, *quære.** The order of the court was enforced with a military escort. The Bishop of Montreal resigned the same year. It was said that Guibord's body was placed inside an iron casket which was put in a sarcophagus which was closed with iron bolts headed down cold, and the whole enveloped in a mixture of hydraulic cement and iron filings, which was allowed to harden. Gunpowder would have no effect upon it. Nothing but nitro-glycerine or Gabriel's trump would be effectual.

A dead body is not the subject of property, and after burial it becomes a part of the ground to which it is committed. *Meagher v. Driscoll,* 99 Mass., 281, 284.

In ancient Egypt, it was customary for a son to raise money by hypothecating his father's corpse. The value of the security was based upon the fact that the Egyptians believed in metempsychosis, and embalmed their dead to preserve the tenement for the returning spirit in some future age. The forfeiture of such a pawn would have meant moral and social leprosy for the defaulter. This hardly proves, however, that the Egyptians recognized property in a dead body. The security is more like the proverbial *pound of flesh.*—W. F. B.

---

*Dame Henriette Brown* and *Les Curé et Marguilliers de l'Œuvre et Fabrique de Notre Dame de Montreal,* 6 Privy Council Appeals, 157.