KOERBER, Appellant, vs. PATEK, Respondent.

*November 16, 1904—January 10, 1905.*

*Dead bodies: Mutilation: Cause of action: Compensatory damages: Injuries to feelings: Who may maintain action: Pleading: Demurrer.*

A complaint alleged that plaintiff was the son and heir of his mother, who died in a hospital; that he was by her, before her death, instructed and requested to take charge of her body for purposes of burial, and was the only person interested; that he did so, removing the body to his place of residence, and proceeding to have the same prepared·for burial; that defendant requested permission to merely examine the stomach of said body, which request being granted, he wilfully, maliciously and fraudulently, without authority, and against the wish of plaintiff, and without any authority at law, and trespassing upon the rights of the plaintiff as custodian of said body and as son and heir, cut out, removed, and carried away the stomach of said dead body, whereby burial became necessary without it, and that thereby the rights of the plaintiff had been recklessly and wilfully trespassed upon, and his feelings greatly injured, so that he has·suffered both in mind and body, to his damage, etc. Defendant demurred to the complaint for defect of parties, and failure to state facts sufficient to constitute a cause of action. *Held:*

(1) The complaint stated a clear legal right, and an unlawful and wilful violation thereof, from which the law implied at least nominal damages, for which, upon fundamental principles of the common law, a right of action existed.

(2) The sense of outrage and the mental suffering to plaintiff, resulting directly from the wilful act charged upon the defendant, were proper independent elements of compensatory damages.

(3) The allegations that plaintiff was the son of the deceased (obviously adult), and that he was the only person having any interest, are sufficient on demurrer to exclude the existence of any surviving husband, or any other child having equal right or duty to supply proper burial to his mother's remains, and that the right of custody and burial, and the resulting right of action for violation thereof, were in the plaintiff.

APPEAL from an order of the circuit court for Milwaukee county: WARREN D. TARRANT, Circuit Judge. *Reversed.*

Appeal from order sustaining demurrer to complaint, which alleged that the plaintiff was the son and heir of his mother, who died in hospital in Milwaukee, and was by her, before her death, instructed and requested to take charge of her body for purposes of burial, and was the only person interested; that he did so, removing the body to his residence, and proceeding to have the same prepared for burial; that the defendant requested permission to merely examine the stomach of said body, which request being granted, he wilfully, maliciously, fraudulently, without authority, and against the wish of the plaintiff, and without any authority at law, and trespassing upon the rights of the plaintiff as custodian of said body and as son and heir, cut out, removed, and carried away the stomach of said dead body, and refused to return the same on request, whereby burial became necessary without it; that thereby the rights of the plaintiff have been recklessly and willfully trespassed upon, and his feelings greatly injured, so that he has suffered both in mind and body, to his damage $5,000.

*Chas. G. Woolcock,* for the appellant.

*Edwin S. Mack,* for the respondent, contended, *inter alia,* that the canon law merely prevented sacrilege. The common law vests the right of burial in the public to be exercised for the benefit of the deceased. No individual can possibly have

any right to a corpse. The ecclesiastical courts acted to prevent sacrilege and had no power to award any damages. 3 Reeves' History Eng. Law (Finlayson's ed.) 70, 71; 2 Bacon's Abridg. tit. Courts Eccles. D. 489; 2 Inst. 493; 3 Bl. Comm. ch. 6; Tyler's Am. Eccles. Law, sec. 94; 2 Burn's Eccles. Law, 51, tit. Courts, sec. 15; Baker's Law of Burials, 8–16. The common law recognizes no rights of any individual in a corpse. The right to require proper burial belongs to the public to be exercised for the benefit of the deceased. 2 Bl. Comm. 429; Cooley, Torts (2d ed.) 281; 3 Inst. 203; 2 East, P. C. 652; *Foster v. Dodd,* L. R. 3 Q. B. 67; *Regina v. Sharpe,* 7 Cox C. C. 214; *Williams v. Williams,* L. R. 20 Ch. D. 659; *In re Brick Presb. Church,* 3 Edw. Ch. 155, 168; *Secord v. Secor,* 18 Abb. N. C. 78; *Guthrie v. Weaver,* 1 Mo. App. 136; *In re Wong Yung Quy,* 6 Sawy. 442–449. There is however at common law a duty on the part of the relatives of a deceased person to give him proper burial. Such burial is in no sense a right of the living, but rather a right of the dead, and the duty is one that is due to the community. It was not the ecclesiastical courts but the common law courts that protected and enforced this right of burial. The method of enforcement shows conclusively that no right ever existed in any individual, and that the duty of burial is owing only to the public. This public duty of burial was enforced like any other public duty, namely by criminal prosecution for failure to perform the duty and by *mandamus* to compel its performance. The duty of burial devolves even on the person in whose house the death occurs. *Queen v. Stewart,* 12 Adol. & El. 773, 40 Eng. Com. Law, 192; *Foster v. Dodd,* L. R. 3 Q. B. 68; *Queen v. Fox,* 2 Q. B. 246, 42 Eng. Com. Law, 658; *Handyside's Case,* 2 East P. C. 652; *Guthrie v. Weaver,* 1 Mo. App. 136; *Keyes v. Konkel,* 119 Mich. 550, 44 L. R. A. 242; *Regina v. Sharpe,* 7 Cox C. C. 214. The relatives of a deceased person may control the disposition of the dead body, and equity gives a remedy for the

very reason that no remedy exists at law. *Pierce v. Swan Point Cemetery,* 10 R. I. 227, 242; *Snyder v. Snyder,* 60 How. Pr. 368, 371; *Secord v. Secor,* 18 Abb. N. C. 78; *Guthrie v. Weaver,* 1 Mo. App. 136; *Thompson v. Deeds,* 93 Iowa, 228; *Fox v. Gordon,* 20 Leg. Int. 374; *Griffith v. C., C. & A. R.* 23 S. C. 25; *Weld v. Walker,* 130 Mass. 422; Cooley, Torts (2d ed.) 280. The decisions on which the appellant relies and particularly those relating to interferences with dead bodies or funerals, have been made in jurisdictions where the doctrine prevails that mental suffering alone is sufficient to sustain a cause of action. *Renihan v. Wright,* 125 Ind. 586, 9 L. R. A. 514; *Louisville & N. R. v. Hull* (Ky.) 57 L. R. A. 771; *Hale v. Bonner,* 82 Tex. 33, 14 L. R. A. 336; *Western U. Tel. Co. v. Ferguson,* 157 Ind. 64; *Wright v. Hollywood Cem. Corp.* 112 Ga. 884; *Gatzow v. Buening,* 106 Wis. 1; *Hockenhammer v. L. & E. R. Co.* (Ky.) 74 S. W. 222; *Larson v. Chase,* 47 Minn. 307; *Pierce v. Swan Point Cemetery,* 10 R. I. 227, 14 Am. Rep. 667; *Bogert v. Indianapolis,* 13 Ind. 134; *Doxtater v. C. W. M. R.* 120 Mich. 596, 79 N. W. 922; *Duffies v. Duffies,* 76 Wis. 374, 377. Any pecuniary damages for injury to the dead body should go to the executor or administrator and not to the relatives. *Samuel v. Estate of Thomas,* 51 Wis. 549; *Pierce v. Swan Point Cemetery,* 10 R. I. 227, 242; *Snyder v. Snyder,* 60 How. Pr. 368, 371; *Secord v. Secor,* 18 Abb. N. C. 78; *Guthrie v. Weaver,* 1 Mo. App. 136; *Thompson v. Deeds,* 93 Iowa, 228; *Fox v. Gordon,* 20 Leg. Int. 374; *Griffilh v. C., C. & A. R.* 23 S. C. 25; *Weld v. Walker,* 130 Mass. 422.

DODGE, J. This action presents a field for consideration uncharted by any direct decisions in this court. The primary and general question is whether any relative, having the conventionally recognized duty of providing proper obsequies and sepulture for the remains of a deceased relative, has any rights, enforceable by courts, to be protected in the

performance of that service.  It is said the law protects only
the person and the purse (*Chapman v. W. U. Tel. Co.* 88 Ga.
763, 15 S. E. 901), and doubtless, as an epigrammatic gen-
eralization, this is reasonably correct.  Upon this basis it is
argued that such a complaint as the present presents no case
of injury either to property or person of the plaintiff—clearly
not to the person physically, and not to the property, it is
argued, because there can be no property in a dead body.  To
the last assertion, numerous English and American authori-
ties are cited.    2 Bl. Comm. 429; *In re Church,* 3 Edw. Ch.
155, 168; *Guthrie v. Weaver,* 1 Mo. App. 136; *Foster v.
Dodd,* L. R. 3 Q. B. 67; *Queen v. Fox,* 42 Eng. Com. Law,
658; *Keyes v. Konkel,* 119 Mich. 550, 78 N. W. 649.  Curi-
ously enough, this doctrine seems to come from the *dictum*
of Lord COKE in *Hain's Case,* 3 Inst. 110, 2 East, P. C. 652,
where, in deciding that ownership of the shroud remained in
those who had purchased it, he gives as a reason, among
others, that the dead body was not capable of ownership.
This remark has been perverted or misunderstood as assert-
ing that the dead body itself is not capable of being property.
Nevertheless the later cases cited support the general propo-
sition stated above.   Among the earliest attempts to approach
the question in America was an interesting discussion by Hon.
Samuel B. Ruggles, as a referee, in the Matter of Widening
Beekman Street, in New York City (4 Bradf. Sur. 503),
which was addressed to the disturbance of the executed right
of sepulture by invading a cemetery.  He there insists that by
the common law of England, before the domination of the ec-
clesiastical establishments, the relatives were recognized as
having rights in dead bodies capable of unlawful invasion,
and therefore of protection or vindication by the courts, and
proceeds to the conclusion that in this country, ecclesiastical
domination not existing, similar rights should be recognized,
among them being the right to bury a corpse and preserve it
from disturbance—a legal right, which courts of law will

recognize and protect; hence that the expense of the removal and suitable reinterment of the bodies in that cemetery was properly recoverable in favor of the relatives. At about the same time the supreme court of Indiana announced the doctrine that bodies of the dead "belong to the surviving relatives, in the order of inheritance as property." *Bogert v. Indianapolis,* 13 Ind. 134. In 1872 the supreme court of Rhode Island was confronted by a controversy between the only child and heir and the widow of a decedent as to the right of the latter to remove the body from its place of original interment to another lot. The court reviews historically the rights of relatives over the burial of their dead under several systems of law, including that of England while pervaded by the doctrine of ecclesiastical control, and said:

"That there is no right of property in a dead body, using the word in its ordinary sense, may well be admitted. Yet the burial of the dead is a subject which interests the feelings of mankind to a much greater degree than many matters of actual property. There is a duty imposed by the universal feelings of mankind to be discharged by some one towards the dead; a duty, and we may also say a right, to protect from violation; and a duty on the part of others to abstain from violation. It may therefore be considered as a sort of *quasi*-property, and it would be discreditable to any system of law not to provide a remedy in such a case." "And a sort of right of custody over, or interest in, the dead body, in the relatives of the deceased, is recognized in the statutes of many of our states." "We may consider it [the body] as a sort of *quasi*-property, to which certain persons may have rights, as they have duties to perform arising out of our common humanity. But the person having charge of it cannot be considered as the owner of it in any sense whatever. He holds it only as a sacred trust for the benefit of all who may, from family or friendship, have an interest in it."

From these views the court deduced the conclusion that a court of equity might control the exercise of those rights by one relative, with due regard to the interests of others or of the public, in suggested analogy to control over the custody

of children by their parents. It was accordingly held, without deciding as to the relative rights of control as between the widow and the children over the original interment, that under the circumstances the widow ought not to remove a body already buried. Since these early cases the questions of the existence of such a right, and of the person in whom it is vested, under varying circumstances, have been discussed under many phases in different states. A partial list of such cases is as follows: *Foley v. Phelps,* 1 App. Div. 551, 37 N. Y. Supp. 471; *Secord v. Secor,* 18 Abb. N. C. 78; *Snyder v. Snyder,* 60 How. Pr. 368; *Patterson v. Patterson,* 59 N. Y. 583; *Johnston v. Marinus,* 18 Abb. N. C. 72; *In re Richardson,* 60 N. Y. Supp. 539; *Griffith v. C., C. & A. R. Co.* 23 S. C. 27; *Farley v. Carson,* 5 Wkly. Law Bul. 786; *Hadsell v. Hadsell,* 7 Ohio Cir. Ct. 196; *Renihan v. Wright,* 125 Ind. 536, 25 N. E. 822; *Wright v. Hollywood C. Corp.* 112 Ga. 884, 38 S. E. 94; *Durell v. Hayward,* 9 Gray, 248; *Meagher v. Driscoll,* 99 Mass. 281; *Weld v. Walker,* 130 Mass. 422; *Burney v. Children's Hospital,* 169 Mass. 57, 47 N. E. 401; *Hackett v. Hackett,* 18 R. I. 155, 26 Atl. 42; *Larson v. Chase,* 47 Minn. 307, 50 N. W. 238; *Young v. College,* 81 Md. 358, 32 Atl. 177; *Wynkoop v. Wynkoop,* 42 Pa. St. 293; *Anonymous Case,* Ohio C. C. 1871, 6 Am. Law Rev. 182; *Pettigrew v. Pettigrew,* 207 Pa. St. 313, 56 Atl. 878; *McEntee v. Bonacum,* 66 Neb. 651, 92 N. W. 633; *Palenzke v. Bruning,* 98 Ill. App. 644; *Enos v. Snyder,* 131 Cal. 68, 63 Pac. 170; *Hockenhammer v. L. & E. R. Co.* (Ky.) 74 S. W. 222.

1. For the purposes of this case we shall not deem it necessary to consider whether a corpse can be, in any respect, property. From the authorities above cited, and from original reason, the conclusion seems to us irresistible that in the nearest relative of one dying, so situated as to be able and willing to perform the duty of ceremonious burial, there vests the right to perform it, and that this is a legal right, which,

as said in some of the cases, it is a wrong to violate, and
which, therefore, courts can and should protect and vindi-
cate.   It is not alone with reference to property that legal
rights exist, nor is it only those invasions of legal rights caus-
ing tangible pecuniary injury for which courts will enter-
tain civil actions and award damages.   It is difficult to dis-
cover any money loss necessarily resulting from an assault
without physical contact; an obstruction of the right to vote;
expulsion from car without physical contact or injury; ma-
licious prosecution; the secreting or even the seduction of a
daughter; the mere alienation of a wife's affections, affect-
ing only the sentimental relations.   Yet courts find no diffi-
culty in entertaining such actions and awarding compensa-
tory damages.   In such cases the clear legal right of exemp-
tion from such wrongful acts is itself the property.   An in-
jury to such a right need not include either an injury to phys-
ical property nor to person or character.   *Gibbs v. Larrabee,*
23 Wis. 496; *Wagner v. Lathers,* 26 Wis. 436; *Wightman v.
Devere,* 33 Wis. 570.   The wrongful invasion of a clear right
is of itself sufficient to support an action, and the law pre-
sumes damages, though they may be only nominal.   *Larson
v. Chase, supra; Pierce v. Proprietors,* 10 R. I. 227; *Luessen
v. Oshkosh E. L. & P. Co.* 109 Wis. 94, 98, 85 N. W. 124;
*Hacker v. Heiney,* 111 Wis. 313, 87 N. W. 249; *Luby v.
Bennett,* 111 Wis. 613, 87 N. W. 804.

True, there are instances of invasion of a clear legal right
where the common law has denied any action, out of consider-
ations of public policy or impracticability of accomplishing
justice; and there are other instances where the common law,
when transplanted across the Atlantic, had not been declared.
The question presented in *Duffies v. Duffies,* 76 Wis. 374, 45
N. W. 522, is an excellent illustration of the latter class.   In
England any action by the wife for alienation of the hus-
band's affections had been denied on the ground that she had

Koerber v. Patek, 123 Wis. 453.

no legal right to his *consortium*—her legal identity being merged in him—and also on the ground that the maintenance of such action was impracticable, since it must be brought by him, and damages would belong to him. This court, adopting the former ground, held that she had no legal right which had been invaded, and hence no action, although the practical difficulties arising from common-law disability to sue alone had been removed. Had this court, as did some others, reached an opposite conclusion as to the existence of a legal right, silence of English courts as to existence of such an action would not have stood in the way of maintaining it. The present case also presents one of the latter class, for English courts had never, so far as discoverable, affirmed or denied existence of such a right of action. This silence is easily ac- 'counted for by the dominance of the church both over the right of custody and burial of the dead, and, through its ec- clesiastical courts, over enforcement or vindication of such rights. Where, during the ages of development and enforce- ment of the common law, no right of action has ever been rec- ognized as arising upon a given state of facts, there is good reason to doubt the existence of any such right upon common- law principles, and courts should examine and re-examine anxiously their reasoning before resolving that doubt in favor of the action. When, however, after all care has been exer- cised, the conclusion is irresistible that the principles of the common law require recognition of such a right of action, it is as much the duty of courts to sustain it the first time as on subsequent occasions. All precedents necessarily have a be- ginning. *"Boni judicis est ampliare justitiam." Rex v. Philips,* 1 Burrows, 304; Broom's Leg. Max. 79; *Pierce v. Proprietors, supra.* While, therefore, the silence of the courts of England during the formative period of that common law which came to America with our ancestors has given us pause, and has caused, if not justified, the scope of investigation and

discussion in this case, that silence alone is no insuperable obstacle to a conclusion in favor of the existence of such rights.

Turning for aid to the decisions of the courts of other states, we find that the question now before us has been several times considered, and that those courts have, with striking unanimity, declared in favor of the maintenance of such an action as this. *Larson v. Chase,* 47 Minn. 307, 50 N. W. 238; *Foley v. Phelps,* 1 App. Div. 551, 37 N. Y. Supp. 471; *Anonymous Case in Ohio,* 6 Am. Law Rev. 182; *Farley v. Carson* (Ohio Dist. Ct. 1880) 5 Wkly. Law Bul. 786; *Burney v. Children's Hospital,* 169 Mass. 57, 47 N. E. 401; *Wright v. Hollywood C. Corp.* 112 Ga. 884, 38 S. E. 94; *Palcnzke v. Bruning,* 98 Ill. App. 644. The later American text-writers recognize such a right of action to be now established upon the authority of these decisions. 1 Sutherland, Dam. § 95, p. 278; 1 Jaggard, Torts, 13; 2 Kinkead, Torts, § 463; 2 Joyce, Dam. § 1048; Perley, Mortuary Law, 28; 8 Am. & Eng. Ency. of Law (2d ed.) 835. The first two, and especially the first of these cases may be considered leading, as they have been cited as the basis for most of the later ones upon this immediate subject, and in many others approaching it. True, some of the decisions cited were not by courts of last resort, but they were emitted from reviewing courts of much respectability sitting *en banc,* and after full argument. In the Minnesota case the real basis of the decision is put by MITCHELL, J., in a paragraph as follows:

"But this whole subject is only obscured and confused by discussing the question whether a corpse is property in the ordinary, commercial sense, or whether it has any value as an article of traffic. The important fact is that the custodian of it has a legal right to its possession for the purposes of preservation and burial, and that any interference with that right by mutilating or otherwise disturbing the body is an actionable wrong. And we think it may be safely laid down as a general rule that an injury to any right recognized and pro-

tected by the common law will, if the direct and proximate consequences of an actionable wrong, be subject for compensation."

We confess our inability to escape, if we would, this logic. We can imagine no clearer or dearer right in the gamut of civil liberty and security than to bury our dead in peace and unobstructed; none more sacred to the individual, nor more important of preservation and protection from the point of view of public welfare and decency; certainly none where the law need less hesitate to impose upon a wilful violator responsibility for the uttermost consequences of his act. We recognize, of course, that public welfare may and does require governmental control in many respects for protection of life and health of the people, and for discovery of crime connected with the death of a person, and to such interests the private right is subservient so far as necessary. Upon this ground rest cases of autopsies upon dead bodies under public authority, and to satisfy police regulations for ascertainment of cause of death. *Young v. College,* 81 Md. 358, 32 Atl. 177; *Cook v. Walley,* 1 Colo. App. 163, 27 Pac. 950; *Palmer v. Broder,* 78 Wis. 483, 47 N. W. 744. Even such authority must be exercised lawfully and reasonably. *Palenzke v. Bruning,* 98 Ill. App. 644. This complaint, however, suggests no such justification. Also we recognize the difficulties in the way of sustaining any action for mere negligence resulting in no pecuniary damage. *Griffith v. C., C. & A. R. Co.* 23 S. C. 27; *Hockenhammer v. L. & E. R. Co.* (Ky.) 74 S. W. 222. In such case the injury to feelings of survivors not being legal damage, at least in Wisconsin, no recoverable damage results from mere negligence in such cases. That situation, however, is not here presented, for the defendant's act is alleged to have been wilful. We are convinced that the complaint asserts a clear legal right—whether in the plaintiff, we shall consider later; also an unlawful and wilful violation of that right, from which the law implies at least nom-

inal damages, for which, upon fundamental principles of the common law, a right of action should exist.

2. The question whether anything more than nominal damages can be recovered has been earnestly argued by counsel, and is only second in importance to that of the existence of any cause of action at all, for, obviously, in cases of this character, any pecuniary loss to plaintiff must usually be merely trifling. The great injury done consists in the outrage upon the sensibilities. Can such injury be considered as legal damage, otherwise than by way of imposing punitory damages in case of actual malice? It is settled in this as in most jurisdictions that mental suffering may be an actual injury, for which award is to be made strictly as compensation in proper cases. *Wilson v. Young,* 31 Wis. 574; *Gatzow v. Buening,* 106 Wis. 1, 19, 81 N. W. 1003. Such injury, however, clearly existent, has been held not a proper element of recoverable damages in ·actions on contract, except breach of promise of marriage. *Walsh v. C., M. & St. P. R. Co.* 42 Wis. 23; *Giese v. Schultz,* 53 Wis. 462, 10 N. W. 598. Nor in actions of mere negligence, unless, as a proximate result of the negligence, there be physical injury from which flows the mental suffering. *Summerfield v. W. U. Tel. Co.* 87 Wis. 1, 57 N. W. 973. In these respects we differ from a few courts which have adopted what is known as the "Texas doctrine," applied originally to failure to deliver telegrams, but since to other phases of both negligence and breach of contract causing mental anguish. In Indiana it has been invoked to support such damages resulting from breach of contract to prepare and preserve a corpse for burial. *Renihan v. Wright,* 125 Ind. 536, 25 N. E. 822. That doctrine, with its supporting authorities, was reviewed fully in the *Summerfield Case,* and repudiated. The only other tort action in Wisconsin where mental suffering was denied as an element of compensatory damages is *Gatzow v. Buening,* 106 Wis. 1, 81 N. W. 1003, which was for a conspiracy to induce the

breaking of a contract to supply a hearse for a funeral; the contract being broken, and, as a result, the funeral interrupted. In many other tort actions mental distress has been held a proper independent element of damage, though in no wise resulting from a physical injury, but directly from the wrongful act—from the outrage of some legal right. Only a few such need be cited. *Craker v. C. & N. W. R. Co.* 36 Wis. 657; *Fenelon v. Butts,* 53 Wis. 344, 10 N. W. 501; *Stutz v. C. & N. W. R. Co.* 73 Wis. 147, 40 N. W. 653; *Grace v. Dempsey,* 75 Wis. 313, 43 N. W. 1127; *Pellardis v. Journal P. Co.* 99 Wis. 156, 74 N. W. 99; *Ford v. Schliessman,* 107 Wis. 479, 83 N. W. 761. It is thus apparent that some torts do and some do not subject the perpetrator to liability to compensate the anguish and suffering which his wrongful act imposes upon the victim. Probably the line between them is not so accurately drawn that the location of every act on the one side or the other is always easy or free from doubt. It is obvious that in mere negligence there is no intent to offer indignity to, or wound the feelings of, another; and it may be legitimately said, as matter of law, that such result from mere inadvertence is so remote and beyond ordinary probabilities that there exists no proximate causal relation between the two, unless a physical injury is caused, out of which, in natural sequence, arises mental, like physical, pain. In *Summerfield v. W. U. Tel. Co. supra,* this court, by the pen of Mr. Justice WINSLOW, quoted approvingly from *Western U. Tel. Co. v. Rogers,* 68 Miss. 748, 9 South. 823, a classification of the torts other than negligence supporting recovery of mental suffering as an independent element, as follows: "Cases of wilful wrong—especially those affecting the liberty, character, reputation, personal security, or domestic relations of the injured party." In *Gatzow v. Buening, supra,* it was said that the wrong there complained of, already described, did not fall within the above category. This was quite obviously true of the particular tort, towit, the conspiracy to prevent

the making or performance of a contract to supply a hearse for a funeral. In that there could be no intent to wound the feelings of plaintiff—he was not in the mind of the conspirators; and, if some such result was to be anticipated as possible, it would be quite as remote as from the mere act of breaking the contract. Such damage would be not the direct result of the conspiracy, but remote and consequential, like the disappointment resulting from breach of a promise to supply on time a wedding present or funeral flowers. The proximate casual relation between the conspiracy and the mental effect was lacking. Counsel seem to read that case as if it were one against Buening alone for his violence and force in physically preventing plaintiff from using the hearse, in abusive and turbulent manner, evincive of an intent to insult and outrage his feelings. Had that been the act complained of, we could hardly have said that it did not fall within the classification approved in the *Summerfield Case,* including willful wrongs affecting the "liberty," "security," or "domestic relations." In *Ford v. Schliessman, supra,* it was pointed out that an assault or technical imprisonment, though without physical contact, falls within the classification of the *Summerfield Case,* because "it invades the personal liberty and rights." Again, in *Hacker v. Heiney,* 111 Wis. 313, 87 N. W. 249, in discussing the contention that there could be no recovery for injury to feelings in absence of other actual damage, it was said:

"The rule for which appellant contends has been applied only to cases of negligence or of alleged personal injury, where the mental suffering can result only from the injury, and not from the tort. It has never been applied to cases of malice, such as false imprisonment and slander."

In *Larson v. Chase,* 47 Minn. 307, 50 N. W. 238, the remarks of Mitchell, J., on this subject, are so philosophical that we cannot forbear quoting them. He says:

"Every injury imports a damage. Hence the complaint stated a cause of action for at least nominal damages. We

think it states more. There has been a great deal of misconception and confusion as to when, if ever, mental suffering, as a distinct element of damage, is a subject for compensation. This has frequently resulted from courts giving a wrong reason for a correct conclusion that in a given case no recovery could be had for mental suffering; placing it on the ground that mental suffering, as a distinct element of damage, is never a proper subject of compensation, when the correct ground was that the act complained of was not an infraction of any legal right, and hence not an actionable wrong at all, or else that the mental suffering was not the direct and proximate effect of the wrongful act. . . . But where the wrongful act constitutes an infringement of a legal right, mental suffering may be recovered for, if it is direct, proximate, and natural result of the wrongful act."

In *Lombard v. Lennox,* 155 Mass. 70, 28 N. E. 1125, it is said:

"If the ordinary and natural consequence of the tort is to cause an injury to the feelings of the plaintiff, and if the acts are done willfully or with gross carelessness of the right of plaintiff, damages may be recovered for mental suffering."

Similar views are expressed by text-writers. 1 Sedgwick, Dam. (8th ed.) §§ 43 to 47; 1 Sutherland, Dam. § 95 *et seq.;* 2 Kinkead, Torts, § 463.

These expressions from other courts are perhaps useful as indicating the philosophy involved in distinguishing between those torts which may and those which cannot be deemed to so proximately cause sense of outrage and mental suffering that the law will recognize such effect as an independent element of recoverable damage, whether resulting merely from some other injury, or directly from the tort itself; but they do not, in our judgment, vary or enlarge the field charted and delimited in the *Summerfield Case,* as above quoted. For the present case we are convinced that sufficient guide can be found in the catalogue there promulgated. Certainly this complaint asserts a "willful wrong," not only in the sense that some injury to plaintiff's legal rights was intended, but also

that an affront to his feelings was so certain to be caused by
the defendant's act that the latter must be deemed to have in-
tended that particular injury. We also think that, without
undue stretch of meaning, the wrong complained of affects the
"domestic relations"—otherwise called the relative rights—
of plaintiff. The duty of surviving spouse, parent, or child
to provide proper burial for the corpse springs from the re-
lationship to the person deceased. The desire to perform
such service is founded in that respect and affection enter-
tained for the relative, of whom the body, it is true, is but the
symbol, but, for the few hours after life ceases, seems so to
still represent him who was, that acts of care and protection
to it are still paid to such departed. Mr. Kinkead says, "The
family tie takes us to the last resting place of our dead"
(2 Torts, § 459), and therefore classes torts of the kind here
presented as committed against the relative rights growing
out of the domestic relations, like seduction or abduction of
wife or child. Mr. Cooley likewise so classifies them. Torts
(2d ed.) p. 280. Recognition that duties arising in the do-
mestic relation persist beyond death is not wanting in the
law. Upon that idea is predicated the liability of the surviv-
ing husband for burial expenses incurred by a stranger for
the body of his deceased wife, in strict analogy to necessaries
furnished her in life. *Bradshaw v. Beard,* 12 C. B. (N. S.)
344; *Cunningham v. Reardon,* 98 Mass. 538; *Patterson v.
Patterson,* 59 N. Y. 583; *Kenyon v. Brightwell* (Ga.) 48
S. E. 124; Bishop, Marriage, Divorce & Sep. § 1258. Stat-
utes providing temporary support out of an estate for widow
and minor children unquestionably find their reason in the
same conception. Doubtless other illustrations might be sug-
gested, but these suffice to satisfy us that there is neither sole-
cism nor unreason in the view that the right of custody of the
corpse of a near relative for the purpose of paying the last
rites of respect and regard is one of those relative rights rec-
ognized by the law as springing from the domestic relation,

and that a wilful or wrongful invasion of that right is one
of those torts for which damages for injury to feelings are re-
coverable as an independent element. Apart from this view,
however, we should deem it indisputable that the tort alleged
is one "affecting the liberty" of plaintiff. The right to en-
tomb the remains of his deceased mother in their integrity
and without mutilation, we have already decided, must be rec-
ognized as a legal one. The liberty of a member of a com-
munity governed by law is not merely freedom from actual
imprisonment, but from obstruction of or interference with
those acts which it is his right to do at will. *State ex rel.
Zillmer v. Kreutzberg,* 114 Wis. 530, 90 N. W. 1098. An
illustration is the right to vote, mentioned in some of the
above-cited cases, with which the right alleged to have been
invaded in this case seems to stand in complete analogy. We
therefore conclude that the sense of outrage and the mental
suffering resulting directly from the wilful act charged on
the defendant in this case are proper independent elements
of compensatory damages.

3. The remaining question is whether the right of custody
and burial, and resulting right of action for violation thereof,
are in the plaintiff. As a result of the decisions and discus-
sions above cited, it cannot be doubted that in the United
States, where no ecclesiastical establishment, as a part of the
government, equipped with executive and judicial powers as
weapons, assumes to itself all authority and right over the
dead body before burial, and over both the body and its place
of sepulture afterwards, there exists in some individual both
the duty and the right to provide to a human body that dis-
position which general welfare requires, with such ceremonies
as convention, respect, and religion dictate. While in the
case of one who died remote from those of closer affinity the
mere relationship of contact may suffice to arouse such duty
in absence of statutes giving charge to some public officer, in
normal conditions of human relationship common consent and

custom recognize the right and the duty to rest upon those
who bore to the deceased in life the closest personal intimacy
of acknowledged and lawful relationship. This because,
while a duty, the preparation and consignment to final rest-
ing place of all that remains of a departed relative is recog-
nized among all civilized peoples as a privilege to continue so
far beyond the limit of life that personal service, tenderness,
and respect which normally characterized the pre-existing re-
lations. Fiction it may be, but none the less actual, that the
attitude of the widower in conferring upon the body of his
departed wife—the parent to that of his child—is personal.
The body is not the person, but, perhaps unconsciously, is so
viewed and treated for the purpose of these last rites of af-
fection. Our statutes give general recognition to this idea by
directing bodies of strangers or convicts to be delivered to
their "relatives or friends." Secs. 1437, 4926, Stats. 1898.
From this point of view, we think, are justified certain con-
clusions as to which, among the survivors, bear this duty and
enjoy the right, which seem to be supported by the general
current of authority. First among these is that the right is
not vested in executors and administrators, as seemed to be
suggested in some English cases quoted somewhat inconsid-
erately in this country. The right, such as we have suggested
it, is not affected by the fact that the funeral expenses may
properly be a charge upon the decedent's estate, and thus ulti-
mately be payable by the executor or administrator. *Samuel
v. Estale of Thomas,* 51 Wis. 549, 8 N. W. 361. That, how-
ever, is the only relationship which such an official has to the
subject. An entirely sufficient practical obstacle to the vest-
ing of either duty or right in such officers in most of the
United States, including Wisconsin, is that they have no ex-
istence at the time when, according to custom, if not neces-
sity, the duty must be performed. Even an executor does not
become such until qualified by a court to act. *In re Somer-
vaill's Will,* 104 Wis. 72, 80 N. W. 65. It seems, too, upon

reason, and authority as well, that, in all normal and ordinary situations, mere intimacy of friendship should be eliminated, or at least subordinated to relations of kinship, as too intangible and indefinite for the law to lay hold of as a basis for either a legal duty or a legal right, although there are some cases where actual domestic relations had been created and held sufficient basis for the right and duty, as where a child was being reared in the family of those not related by blood or adoption.  We have no doubt that, save for very exceptional conditions, the right of burial of a dead body rests primarily with those connected with the deceased, in life, by some ties of legal relationship, and we agree with the great weight of authority that foremost and closest in such relationship stands the surviving spouse.  If, as we have indicated, this is but an extension beyond death of pre-existing service and duties, what of those are in so close analogy as the service involved in the *consortium* between husband and wife—personal attendance, care, and service, shielding from insult, supply of necessities, and the like?  Certainly none. Before them, all analogies drawn from property rights of inheritance in kinsmen by blood fail as reasons of legal precedence in the performance of these final duties to our departed.  We cannot doubt that the word "relatives," in the above-cited statute, includes the surviving spouse, though in other statutes it may not.  *Cleaver v. Cleaver,* 39 Wis. 96.

In absence of any surviving spouse, situations become subject to such complications that it probably is not wise, if proper, to attempt to declare general rules beyond the case actually presented.  Suffice it to say that the duty and right of the parent toward the body of a minor child dying a member of his household, or of the adult child toward a widowed parent, either a member of the child's family circle, or not a member of any other, seems too clear to warrant discussion. That, however, carries the subject far enough to dispose of the question whether the plaintiff is the person entitled to

bring this action, for the complaint alleges that he is the son of the deceased, obviously adult, and that he is the only person having any interest. On demurrer, this is sufficient to exclude existence of any surviving husband or any other child having equal or greater right or duty to supply proper burial to his mother's remains. If others exist whose rights would suffer invasion by such acts as are charged against defendant, so that they would have action therefor, that fact can be set up by defendant, and the necessity or propriety of their joinder be then considered.

The foregoing discussion, protracted perhaps unduly in deference to the novelty of the question in Wisconsin, and to the earnestness of counsels' argument, leads to the final conclusion that the complaint states a good cause of action in favor of the plaintiff, and that the trial court erred in sustaining the demurrer.

*By the Court.*—Order reversed, and cause remanded with directions to overrule the demurrer.