HIRSCHEL B. STURGEON, APPELLEE, V. CROSBY MORTUARY,
INC., APPELLANT.

299 N. W. 378

FILED JULY 18, 1941.   No. 31098.

*Joseph D. Houston* and *James T. English,* for appellant.

*Leon, White & Lipp* and *Boyle & Boyle, contra.*

*Young & Williams, amici curiæ.*

Heard before ROSE, EBERLY and YEAGER, JJ., and KROGER and ELLIS, District Judges.

EBERLY, J.

This was an action at law brought by Mrs. Hirschel B. Sturgeon, plaintiff, against Crosby Mortuary, Inc., a corporation, doing business under the name of Crosby-Carlson-Meyer Mortuary, defendant. By this action plaintiff sought to obtain damages sustained by her resulting from the alleged unauthorized dissection and mutilation of the body of her deceased husband, made by the coroner's physician of Douglas county in the making of an autopsy in the performance of his official duties, because this autopsy thus performed was consented to and permitted by the defendant within the confines of its mortuary while in custody and possession of the body for the purpose of preservation and sepulture, and without notice to or consent of the plaintiff. At the close of all the evidence the defendant moved for a directed verdict, which was overruled. Whereupon the trial court determined that plaintiff's cause of action was established by the proof as a matter of law, and, by the court's instructions, the only question submitted to the jury was the determination of the amount of damages sustained by the plaintiff. The jury returned a verdict against the defendant for the sum of $3,000. Defendant filed a motion for a new trial. The court ordered a remittitur in the sum of $1,500 to be filed, or the motion for a new trial would be sustained. The required remittitur was filed, and the motion for a new trial was overruled. The defendant appeals.

The facts involved and surrounding the transaction under consideration include the following: Hirschel B. Sturgeon, the plaintiff's husband, on the morning of October 11, 1937, about 8 o'clock a. m., took the plaintiff from their home at No. 2502 North Forty-eighth avenue, in Omaha, Nebraska, to the Tudor Arms Apartment at 131 South Thirty-ninth street, Omaha. She there conducted a beauty parlor. Her husband was engaged in the selling of typewriters and

office supplies at a down-town establishment. There is no evidence that anybody saw him alive after the completion of this morning trip. Plaintiff testifies that she talked with him over the telephone at his place of business about 11:30 a. m. About noon the same day a violent explosion occurred at the plaintiff's home. A policeman heard the noise and rushed to the scene of the explosion. Finding the door locked, he broke through and found the body of Mr. Sturgeon in the kitchen on the floor face down. There were no other occupants in the home at this time. He carried the body outside and, finding no pulse in the body, he put in a call for the "inhalator squad," who with the fire department came to the scene, but the man was dead. Upon the scene came firemen, policemen, the county attorney's special investigator, a physician, the defendant undertaker, neighbors and others. A great deal of damage had resulted from the catastrophe. The explosion had raised the ceiling, blown out the windows, a closet in a bedroom blown up, entrance to a hall blown out, roof raised, and a fire within the house ignited and some damage had been occasioned thereby. No physician was attending Sturgeon when he died, no one saw him die, no one knew how or when he died, or the cause of the explosion, or what exploded. There was a cut on the dead man's head and blood was coming from his ear. There was an odor of gas in the building in which he died. The official investigator, after a discussion with the police and others present at the scene of the death, found it impossible to ascertain whether gas jets on the stove were found open immediately after the explosion, and, if open, who had closed them. At Mrs. Sturgeon's direction the body was taken by the defendant, Crosby Mortuary, to its undertaking establishment to be prepared for burial. The county attorney's special investigator, as instructed by the county attorney, communicated with the coroner's physician, Dr. Earl A. Connolly. The latter went to this funeral home, examined the body, and found it necessary to perform an autopsy to determine the cause of death, and told the persons in charge of the mortuary he would return

later. He communicated with Mr. Jaap, the special investigator, one of the men from whom he had received his instructions in the past, and returned to the mortuary and performed the autopsy at 5 o'clock p. m. He found the cause of death to be inhalation of carbon monoxide gas, and made the necessary death certificate. It is stipulated that no coroner's jury was impaneled in connection with the case; that Mr. Jaap was the special investigator of the county attorney, *ex officio* county coroner; and that his (Jaap's) duties were to make full investigation in coroner's cases. It is fairly established by the evidence that the autopsy was performed by the coroner's physician, acting in his official capacity, and that the same was done in a decent and scientific manner.

The contentions of the prevailing party are, briefly: That the widow of the deceased has the right to the possession of the dead body of her husband in the same condition it was in when death intervened; that an autopsy unauthorized by his widow, or by some other person having authority to so direct by law, is an invasion of the right of the widow; and that a coroner may not order an autopsy except under the circumstances prescribed by statute and only after an inquest.

And, as epitomized by the trial court in its instructions to the jury in this case, we find the following: "The statutes of the state of Nebraska provide that when the circumstances show it possible that death was caused by negligence, violence, or any unlawful means, the case shall be referred to the county attorney for investigation and certification and he shall state the cause of death as ascertained, giving as far as possible the means or instrument which produced the death, but the statutes do not give any right to hold an autopsy without an inquest. * * * When such inquest is held and a *post mortem* examination is deemed necessary the coroner is then authorized to cause an autopsy to be held. The coroner has no legal right to conduct an inquest or to cause an autopsy to be held in the course of an inquest unless he has reason to believe that it is possible that the person

died by unlawful means, or unless he has been requested to do so by the widow. * * * Since the autopsy (in the present case) was wholly unauthorized and illegal, all persons who assisted, advised, aided, abetted, incited, commanded, countenanced, or cooperated in conducting the autopsy are liable jointly and severally to the plaintiff. * * * Since the coroner's physician's acts were wrongful and without lawful justification, the defendant who permitted the unlawful act is equally liable for the consequences."

The correctness of these conclusions is challenged by the appellant herein as unsupported by the controlling statutory enactments and the reasons evidenced by the same.

The office of coroner, an ancient officer at common law, we have inherited or adopted from the common law of England. The powers of a coroner at common law were "in great measure ascertained by statute 4 Edw. I, *de officio coronatoris;* and consist, first, in inquiring, when any person is slain, or dies suddenly, or in prison, concerning the manner of his death. And this must be *'super visum corporis;'* for, if the body be not found, the coroner cannot sit. He must also sit at the very place where the death happened; and his inquiry is made by a jury from four, five or six, of the neighboring towns, over whom he is to preside. If any be found guilty by this inquest, of murder or other homicide, he is to commit them to prison for further trial, * * * and (he) must certify the whole of this inquisition (under his own seal and the seals of his jurors * * *) to the court of king's bench." 1 Cooley's Blackstone (3d ed.) *348.

The first territorial legislature of Nebraska adopted "An Act to put into force in this territory the common law of England," approved March 16, 1855, which provided: "That so much of the common law of England as is applicable and not inconsistent with the Constitution of the United States, with the organic law of this territory, or with any law passed or to be passed by the legislature of this territory, be and the same is adopted and declared to be law within said territory." 1 Complete Session Laws of Nebraska, 1855 to 1865, p. 144. After admission of the territory of Nebraska

as a state, this act was amended by substituting the words "this state" for "this territory" and "within the state of Nebraska" for "within said territory," and as thus amended it still continues in force.

Later the territorial legislature adopted "An Act to provide for the election, and define the duties of coroner," approved January 13, 1860. Sections 5-11 of this act provide, in substance, that the coroner shall hold an inquest upon the dead bodies of such persons only as are supposed to have died by unlawful means, found or being in his county; require him to issue his warrant to a constable to summon a jury, and prescribe the holding of an inquest by the coroner and such jury, and the return by such jury of their inquisition in writing setting forth, with reference to the deceased, "when, how, by what person, means, weapon, or accident he came to his death, and whether feloniously." 1 Complete Session Laws of Nebraska, 1855 to 1865, pp. 646, 647. This was substantially the reenactment of the common law without material change except as necessitated by the difference in governmental institutions.

It will be noted that section 18, chapter VIII of the laws of 1866 (2 Complete Session Laws of Nebraska, 1866 to 1877, p. 13), added the following provision: "If the coroner or jury deem it necessary, for the purposes of an inquisition, to summon a surgeon, the coroner shall issue his subpœna for the one preferred, the same as for any other witness."

Certain amendments and additions have been made to the foregoing enactments for the evident purpose of increasing their effectiveness as law enforcement agencies. Thus, in 1907 the legislature of that year adopted an act providing for the appointment of a coroner's physician in counties having more than 125,000 inhabitants, and further providing that such coroner's physician should be appointed by the coroner and be removable by him; that such coroner's physician "shall make *post mortem* examinations of dead bodies and give testimony as to the same without witness fee in all inquisitions and state and county cases when called by the coroner, county or state, and shall perform such

other services in aid of the coroner as shall by him be requested." Laws 1907, ch. 35, sec. 1.

The legislature of 1915 introduced two changes to the law under consideration. By section 1, ch. 101, approved April 15, 1915, it amended section 5663, Rev. St. 1913, to read: "The coroner shall hold an inquest upon the dead bodies of such persons only as are supposed to have died by unlawful means. When he has notice of the dead body of a person, supposed to have died by unlawful means, found or being in his county, he may in his discretion issue his warrant to a constable of his county requiring him to summon forthwith six lawful men of the county to appear before the coroner at a time and place named in the warrant."

This same legislature of 1915 enacted chapter 224 of the session laws of that year, approved March 16, 1915, providing: "On and after the first Thursday after the first Tuesday in January, 1917, the county attorney shall perform all of the duties enjoined by law upon the county coroner and the county attorney shall be the *ex officio* county coroner. * * * The county attorney may delegate to the county sheriff that part of the coroner's duties as now prescribed by statute which relate to viewing dead bodies," etc. Laws 1915, ch. 224, sec. 1.

In addition, section 71-2405, Comp. St. 1929, originally enacted in 1919 (Laws 1919, ch. 190) and thereafter amended in 1921 (Laws 1921, ch. 253) and again in 1927 (Laws 1927, ch. 166) provides, in part: "The undertaker or person in charge of the funeral of any person dying in the state of Nebraska, shall cause a certificate of death to be filled out with all the particulars contained in the standard blank adopted by the department of public welfare, and conforming to all of the requirements of the United States census bureau, including a statement of the cause of death, made by a person holding a valid license as a physician, and who was last in attendance upon the deceased; such physician is hereby made responsible for, and it shall be his duty to complete and sign in his own handwriting that part of the certificate of death entitled 'medical certificate

of death' or in cases of death where no person licensed as a physician was in attendance, the undertaker shall refer the case to the health officer for a death certificate, but if the circumstances show it possible that death was caused by neglect, violence or any unlawful means, the case shall be referred to the county attorney for investigation and certification, and he shall state the cause of death as ascertained, giving as far as possible the means or instrument which produced the death."

In 1919, by the adoption of chapter 64 of the session laws of that year, it was provided: "In counties having a population exceeding one hundred and fifty thousand people, there may be spent under the direction and control of the county attorney a sum of money not exceeding fifteen hundred dollars in any one year, to be paid out of the general fund of the county, for the employment of a detective or detectives, the same to be appointed by the county attorney at such rates of compensation per day as may be fixed by said officer, and said appointment may be revoked by him at any time."

The effect of the act (Laws 1915, ch. 224) providing that "the county attorney shall perform all of the duties enjoined by law upon the county coroner and the county attorney shall be the *ex officio* county coroner," is to incorporate in the new law the existing law defining the duties of the coroner. This act is complete within itself and the powers and duties vested in county attorneys are not judicial within the meaning of our constitutional provision but rather administrative in character. *State v. Moorhead,* 100 Neb. 298, 159 N. W. 412. The principle, "legislation by reference," has been accorded unquestioned recognition by our precedents. *Richardson v. Kildow,* 116 Neb. 648, 218 N. W. 429; *Sheridan County v. Hand,* 114 Neb. 813, 210 N. W. 273.

Whatever the source of their official powers, whether by direct authorization by statute or by reference to enactments already in being, they are vested in and exercisable by county attorneys as such solely by virtue of the office of which they are lawful incumbents, and without any other

warrant or appointment than that resulting from the holding of that particular office. The office of county coroner has ceased to exist, and the lawful powers, rights and duties of county attorneys are determinable, so far as the instant case is concerned, by a proper construction of all the statutory sources from which derived, certain of which we have already set out herein.

The above provisions fairly construed evidence a clear legislative intent to strengthen and reinforce the law enforcement agencies of the state by adjusting their methods to modern conditions and to the requirements of an increasing congested urban population. Thus, the county attorneys, the chief law enforcing officers of their respective counties, in turn supplant the historical coroners, to the end that more efficient service may be rendered at less cost. In addition, there is provided for the county attorney of Douglas county two official assistants, to aid him in the proper performance of his duties, a "coroner's physician" and also a "special investigator for the county attorney's office." When the importance, extent, nature and scope of the duties imposed on the office of county attorney of Douglas county are considered, the absolute necessity of this needed assistance is obvious.

Then too, in 1915 (Laws 1915, ch. 101) the same legislature which enacted the provision that the county attorney shall perform all of the duties of the county coroner amended what is now carried as section 26-1502, Comp. St. 1929, so as to make the issuance of the warrant for a jury for an official inquest a matter of discretion. The effect of this amended provision was to continue in full force the legislative mandate that upon the dead body of a person supposed to have died by unlawful means an inquest should be held by the county attorney, but that in each case the issuance of the warrant for a jury of "six lawful men" was a matter within his discretion. This change in the statutory language employed establishes by necessary implication that, the calling of the jury not being mandatory, an investigation made and inquest held by the county attorney, without the assist-

ance of a jury, is not necessarily illegal as in contravention of law. In such a case the law by fair inference contemplates an inquest and investigation by the official alone. The statutes of this state do not differentiate between inquisitions made by county attorneys with assistance of a jury and those made by him without. Neither is there any difference in the methods of investigation indicated in the two proceedings. The same circumstances that would justify an autopsy upon a dead body in one case would equally support it in the other. In certain legislative acts hereinbefore referred to, the duty of the county attorney to prosecute investigations in cases wherein the circumstances show it possible that death was caused by "neglect, violence or any unlawful means," exists, in which event he is required in his determination to state the cause of death as ascertained, giving as far as possible the means or instrument by which it was produced. It is obvious that there is but little substantial difference between the meaning of the phrase "neglect, violence or any unlawful means," as employed in the legislation last referred to, and the term "unlawful means," as used in section 26-1502, Comp. St. 1929. There is no inconsistency. It is apparent that an inquisition by a county attorney in his official capacity is entitled to the same consideration as that of a county attorney when aided by a statutory jury of "six lawful men."

We have no statute in this state which in express terms defines a lawful autopsy or the circumstances which might be said to be a condition precedent thereto. Inquests are justified when under the circumstances then existing it is necessary to determine whether a death resulted from "unlawful means." The lexicographers define the word "unlawful" as, "acting contrary to, or in defiance of, the law; disobeying or disregarding the law; of persons." Webster's New International Dictionary (2d ed.) p. 2783. While necessarily not implying the element of criminality, it is broad enough to include it.

Considering the statutory provisions involved and the public purpose of the entire proceeding, an autopsy is re-

quired and justified when necessary to determine that the cause of death of a human being who had departed this life did not involve unlawful means, and when necessary to secure the information that will enable the county attorney to fully perform the duties enjoined upon his office in reference thereto. It is in all respects a matter of public interest in which public safety is necessarily involved.

Under these conditions, the county attorney may legally order an autopsy to be made, when, in his judgment, that is the appropriate means of ascertaining the cause of death, and he may do so without consent of the family, for such power is incident to the county attorney's official duty. 13 C. J. 1250.

Jurisdiction to hold an inquest is conferred upon a county attorney by the finding and custody in his county of the body of a person who has apparently come to his death by violent, mysterious or unknown means. *Moore v. Box Butte County,* 78 Neb. 561, 111 N. W. 469.

From a careful examination of the facts disclosed by all the testimony, we conclude: That the county attorney of Douglas county had jurisdiction to hold an inquest in the present case without the intervention or assistance of a jury; that this decision as made by him was sustained by the facts within his knowledge at the time it was ordered, and constituted a reasonable exercise of the powers of his office; that the acts of his statutory assistants in connection therewith were legally performed and required by the public policy of the state.

Upon the general question of the right of public authorities to hold an inquest, and as an incident thereto to have autopsies performed, the following cases are cited: *Kingsley v. Forsyth,* 192 Minn. 468, 257 N. W. 95; *Cook v. Walley & Rollins,* 1 Colo. App. 163, 27 Pac. 950; *Rushing v. Medical College,* 4 Ga. App. 823, 62 S. E. 563; *Young v. College of Physicians and Surgeons,* 81 Md. 358, 32 Atl. 177; *Meyers v. Clarke,* 122 Ky. 866, 90 S. W. 1049, affirmed in 122 Ky. 873, 93 S. W. 43.

It appears that the coroner's physician performed the

autopsy in the instant case lawfully, by the authority of the county attorney, and in proper performance of his statutory duties. The defendant mortuary in no manner transgressed the legal duties it owed to its employer, the plaintiff herein, and the evidence in the record is wholly insufficient to establish a cause of action against it.

It follows that the judgment entered in the district court is erroneous, and it is, therefore, reversed and the cause dismissed.

REVERSED AND DISMISSED.