ALICE K. LUM, NANCY K. CHING, ALBERT K. Y. KONG, ELLEN K. CHANG AND ABBIE K. CHANG *v.* WILLIAM FULLAWAY.

No. 3075.

Argued February 27, 1958.                    Decided April 30, 1958.

RICE, C. J., STAINBACK AND MARUMOTO, JJ.

This is an interlocutory appeal by defendant from a decision of the circuit court denying his motion to dismiss the plaintiffs' amended complaint.

In their amended complaint, plaintiffs alleged the following facts: that they are adult children of Lee Kong Shee, a widow; that their mother was seriously injured in an accident which resulted from defendant's negligence in driving his automobile; that she suffered such mental anguish and physicial pain from the injuries that she became delirious, bereft of reason, and subject to uncontrollable impulse, and took her own life; that she was incapable of paying the hospital, medical and nursing expenses incurred in the treatment of her injuries; that such expenses amounted to $9,898.55; that she left no asset from which the expenses of her funeral might be paid; that funeral expenses amounted to $1,592.10; that they made partial payments of such expenses under threats of litigation; and that they are subject to litigation if they do not pay the balance of such expenses.

Defendant's motion to dismiss questioned the sufficiency of the complaint to state a claim upon which relief can be granted.

Plaintiffs also alleged that R.L.H. 1945, § 12290, imposed upon them a legal obligation to pay such hospital, medical, nursing and funeral expenses. That allegation, however, is a conclusion of law. On a motion to dismiss, well-pleaded allegations of fact are taken as admitted, but not so with conclusions of law. (Moore's *Federal Practice,* 2d Ed., § 12.08)

The provisions of R.L.H. 1945, § 12290, are compiled in R.L.H. 1055, § 330-22. The statute makes the adult children of any person who is incapable of self-support "liable, to the extent of their financial ability, for the support of such person." Such statutory liability is enforced by a court order entered in a proceeding initiated by the

information of the attorney general or any county attorney, or the sworn complaint of any person in charge of any public or private hospital or institution for the care of indigent persons. The statute does not expressly provide that the liability for support includes payment of medical and funeral expenses.

Plaintiffs claim that they are entitled to recover the expenses of medical treatment and funeral expenses in their own right, independently of any right that their mother might have had, and that their right is not derived from their mother's right of recovery.

Defendant's position is that the plaintiffs have no independent right of recovery and that they have no derivative right because at the time of their mother's death there was no local statute providing for the survival of tort claims.

The amended complaint does not set forth the date of death of plaintiffs' mother. However, it is clear that plaintiffs' mother died before the effective date of R.L.H. 1955, § 246-6, which provides for the survival of causes of action based on tort. The statute became effective on May 27, 1955. (S.L.H. 1955, Act 205) The amended complaint was filed on July 8, 1954.

Defendant's position is based on lack of judicial precedent to support plaintiffs' claims. He argues that it is the function of the legislature to fill any void in law, that the recognition of plaintiffs' claim in the instant proceeding will be judicial legislation, and that this court should not indulge in judicial legislation.

Plaintiffs' right to relief is not necessarily foreclosed by lack of precedent. True, there is a constant admonition against judicial legislation. But the genius of the common law, upon which our jurisprudence is based, is its capacity for orderly growth. (*Dole* v. *Gear*, 14 Haw. 554; *Territory* v. *Alford*, 39 Haw. 460; *Welsh* v. *Campbell*, 41 Haw. 106;

*Halberg* v. *Young,* 41 Haw. 634) The vehicle by which such growth is accomplished is what may be described as judge-made law. This is evident in the utterances of such learned oracles of law as Sir Frederick Pollock, Judge Benjamin Cardozo and Judge Learned Hand. (Pollock, "Judicial Caution and Valour," *Jurisprudence in Action,* p. 367; Cardozo, *The Nature of Judicial Process,* p. 28; Hand, "Cardozo's Nature of Judicial Process," *Jurisprudence in Action,* p. 235)

Sir Frederick Pollock states:

"Ever since there have been in England regular courts of justice administering the law of the land, their duty has been understood not to be fulfilled merely by finding some decision for every case, but to extend to declaring rules of law, and developing them to meet new occasions, so far as may be done without disobeying the expressed will of the Legislature or contravening doctrine already settled or confirmed by former judgments."

The same theme is set forth by Judge Hand as follows:

"The position of an English speaking judge, especially, presents an apparent contradiction that has always exercised those who are speculatively inclined. The pretension of such a judge is, or at least it has been, that he declares pre-existing law, of which he is only the mouthpiece; his judgment is the conclusion of a syllogism in which the major is to be found among fixed and ascertainable rules. Conceivably a machine of intricate enough complexity might deliver such a judgment automatically were it only to be fed with the proper findings of fact. Yet the whole structure of the common law is an obvious denial of this theory; it stands as a monument slowly raised, like a coral reef, from the minute accretions of past individuals, of whom each built upon the relics which his predecessors

left, and in his turn left a foundation upon which his successors might work."

Perhaps, the recent trend is to rely more on legislatures, and less on courts, for the growth of law. Nevertheless, judicial law-making continues inexorably. This is recognized by Judge Cardozo, who states: "We leave more to legislatures today, and less perhaps to judges. Yet even now there is change from decade to decade. The glacier still moves."

Judicial law-making does not mean that judges may roam at will on a frolic of their own. Judge Cardozo again aptly sets forth the responsibility of a judge, when confronted with a novel question, as follows:

"In this perpetual flux, the problem which confronts the judge is in reality a twofold one; he must first extract from the precedents the underlying principle, the *ratio decidendi;* he must then determine the path or direction along which the principle is to move and develop, if it is not to wither and die."

In considering the respective contentions of the parties, the question as to plaintiffs' right to recover the expenses of medical treatment may be considered separately from the question as to their right to recover funeral expenses. The two questions present distinct and different problems.

We shall first take up the question of hospital, medical and nursing expenses.

We are of the opinion that the duty imposed by our statute upon adult children to support their indigent parent includes the furnishing of necessary medical treatment. Courts have construed a variety of statutes imposing a duty of support as requiring the payment of medical expenses. (*Owens* v. *State,* 6 Okl. Cr. 110, 116 P. 345; *State* v. *Clark,* 234 N.C. 192, 66 S.E. [2d] 669; *Boller* v. *Crider,* 31 N.Y.S. [2d] 987) Furthermore, the inclusion of necessary medical treatment is implicit in the provision which

authorizes any person in charge of a hospital to initiate the proceedings for the enforcement of the statutory liability.

Logically, the duty imposed upon adult children for the support of their indigent parent is no different from the duty imposed upon parents for the support of their minor children. The incidents of the duty of support, whether such duty is owed by adult children to their indigent parent or by parents to their minor children, should be the same.

An incident of parental duty to support minor children is the parents' right to recover, in their own right, from a tortfeasor the expenses of medical treatment where their child is injured by the tortfeasor. (Restatement of Torts, § 703; Prosser, *Law of Torts,* 2d Ed., § 104; Harper and James, *The Law of Torts,* § 8.8; *Sykes* v. *Lawlor,* 49 Cal. 236; *Dennis* v. *Clark,* 2 Cush. 347, 56 Mass. 347)

The basis for such right of recovery is explained in 39 Am. Jur., *Parent and Child,* § 80, as follows:

"This rule is predicated upon the proposition that a parent is primarily responsible for necessaries furnished his minor children, and that, while, if he fails to pay the bills incurred in treating a child's injuries, the child's estate may be liable therefor as for necessaries, the parent, being primarily responsible, and supposedly willing to pay the bills, should be allowed to recover, as against the claim that the item of damages belongs to the child."

In *Sykes* v. *Lawlor, supra,* in holding a tortfeasor liable to a parent for medical expenses occasioned by a tort committed on a child of tender years, who was incapable of rendering services, the court stated:

"The weight of authority in England is to the effect that in an action by a parent for injuries to his minor child under his care, the *gravamen* of the action is the

loss of service; as incidental to which he may recover the expense of nursing and healing the child. But if the child be of such tender years that it was incapable of rendering any service whatever, there could be no recovery, even for the expenses. * * * But in this country a more liberal rule has been adopted; and the best considered cases hold that inasmuch as it is a duty enjoyed by the law of the land as well as by the laws of nature, upon the parent, to care for and heal his injured minor child, he who willfully or negligently occasioned the injury should be held responsible for the expenses incurred, without reference to the capacity of the child to render service to the parents. In the case of *Dennis* v. *Clarke* (2 Cush. 347), the Supreme Court of Massachusetts, in an able and exhaustive opinion, examined the authorities, and arrived at the conclusion above stated. We are fully satisfied with the reasoning of that case, and think the rule it establishes is founded in reason and justice."

*Dennis* v. *Clark, supra,* also, was an action by a father against a tortfeasor for the recovery of medical expenses incurred in connection with a tort committed on a child who was too young to be capable of rendering any service. It was a case of first impression in the jurisdiction involving such claim. However, there were precedents involving claims for recovery of medical expenses incurred in connection with torts committed on wives, where the husbands lost neither the wives' services nor their society. The court allowed recovery on the basis of such precedents. It stated:

"But a husband, in England, as well as here, may maintain an action for a personal injury done to his wife, whereby he sustains loss and is obliged to incur expense in her cure. The declaration, in such action, generally avers, as the precedents show, his loss of her

society, or her services, or both, and also the expense necessarily incurred by him in consequence of the injury inflicted upon her. But there may be cases of injury to a wife, where the husband thereby loses neither her services nor her society, and yet may be obliged to pay money for care and attendance upon her while she is suffering under the injury done to her by a third person. The husband may be in India, and the wife on her voyage to join him. If, on the voyage, she is mistreated or injured, so as to require medical or other assistance, which cannot be obtained gratuitously, we cannot doubt the husband's liability to pay for it, nor his right to recover an indemnity from the guilty party. On the same ground, we hold, that where an infant child is injured by a wrong-doer, and the father, in consequence thereof, necessarily incurs expense in procuring attendance upon the child, he may recover an indemnity, although he has not lost the services of the child, because of the child's incapacity to render him any service."

Thus, in *Dennis* v. *Clark,* the court extracted a *ratio decidendi* from precedents involving the duty of husbands to furnish medical treatment to their wives and applied it to a case involving parental duty to furnish medical treatment to minor children. Here, we have a case involving a statutory duty imposed upon adult children to support their indigent mother, which includes the furnishing of medical treatment. Are we to say that the *ratio decidendi* of cases involving husband-wife relationship extends to parent-minor child relationship, but not beyond, without legislative aid? If we do so, the heritage of the common law, to us, will be only a mossy relic, when elsewhere it is still a dynamic force in the growth of the law.

In *Clinton* v. *Laning,* 61 Mich. 355, a father brought an action against the defendants to recover damages for

his loss by being compelled to support his adult son who was rendered incapable of self support by defendants' tortious act. The father became liable for the support of his adult son under a Michigan statute which imposed upon the "father, mother, and children, being of sufficient ability, of any poor person who is blind, old, lame, impotent, or decrepit, so as to be unable to maintain himself," the duty of supporting such person. The court recognized the father's right of recovery against the tortfeasors. In so doing, it stated:

"It is not seriously claimed that any action lies in this case out of the mere relation of parent and child. The son was not a minor, and the father was in no way injured by loss of his earnings, or deprived of any reliance for his own support. If an action lies at all, it is upon the ground that plaintiff has, in some way, been 'injured in his property' by the casualty for which defendants are sought to be made responsible.

"The statutes do not make a father liable for his son's support to any extent after majority, unless he has become subject to the condition of a pauper, and liable to be a public burden. In such a case, if able to do so, the law makes him responsible to such an extent as may be determined on a proper investigation. As the ability here is admitted, and the need of support is also admitted, there can be no doubt that plaintiff, if refusing, would be compelled to make necessary provision. The only question that would arise in case of his refusal would be as to the terms and manner of his contribution.

"There is, no doubt, some difficulty in substituting a jury for the proper local authorities in getting at the proper estimate of expense. But we think the law does not require a father to attempt to turn over his son to the custody of the superintendents of the poor before

he can be regarded as under a duty of maintenance. The law requires the parent, if able, to maintain the son 'in such manner as shall be approved by the directors of the poor of the township where such poor person may be.' * * * It is only on failure to do so that any order becomes necessary, as provided by the subsequent sections.

"We think that the voluntary assumption of this duty may fairly be regarded as performing a legal obligation, and that expenditures to a proper extent, within the limit which could be laid down by compulsion, are as valid charges as if they had been compelled, and may be considered as on a similar footing."

Sir Frederick Pollock, in his lecture on "Judicial Caution and Valour," *supra,* states:

"Law is reason, as a medieval judge said in rebuke of a colleague's jesting remark that the law is what the judges choose; but not the reason of any one man or assignable body of men. The Court has to look to an ideal standard, which cannot be precisely defined, but is none other than that general consent of right-minded and rightly informed men which our ancestors of the profession called Reason, and Continental doctors the Law of Nature. Speculative opinions as to its origin are here irrelevant. Translating this into modern terms, we may say that the duty of the Court is to keep the rules of law in harmony with the enlightened common sense of the nation. Such a duty, being put upon fallible men, cannot be performed with invariable and equal success. It is a matter of judgment, knowledge of the world, traditional or self-acquired bent of opinion, and perhaps above all of temperament. Caution and valour are both needed for the fruitful constructive interpretation of legal principles. The Court should be even valiant to override the merely technical dif-

ficulties of professional thinking, and also current opinions having some show of authority, in the search for a solution which will be acceptable and in a general way intelligible to reasonable citizens, or the class of them whom the decision concerns. Judicial valour of this kind is in no way akin to headstrong ambition or love of innovation for its own sake. Rather it is the 'sad wise valour' which an excellent poet recommended for the conduct of life, using 'sad' to denote not a depressed but a serious and resolute mood, a meaning still current in his time."

We think that a failure to extend the precedents established in husband-wife relationship and parent-minor child relationship to the instant case is neither logical nor consonant with the enlightened mood of the times.

Law, according to Justice Holmes, reflects the felt necessities of the time, and is a witness and external deposit of our moral life. (Holmes, *Common Law*, p. 1; Holmes, "Path of the Law," *Collected Legal Papers*, p. 170) Our statute which imposes upon adult children the obligation to support their indigent parent is a manifestation of the moral climate of our times. Like many legislative acts, it is incomplete in that it imposed an obligation without providing for the assertion of an incidental right.

Defendant denies that it is the function of the judiciary to supply the missing element. He says, "It is not for our courts to legislate in this field." If we follow defendant's argument, the legislature alone may keep up with the times and the courts are but automatons to match the colors provided by previous legislative acts and by established precedents.

We do not think that the legislature has become so potent, and the judiciary so atrophied, that we must defer to the former in every situation where the colors do not match.

We hold that, as to hospital, medical and nursing expenses, the amended complaint sufficiently sets forth a claim upon which relief can be granted.

With regard to funeral expenses, plaintiffs' right to recover depends upon whether the death of their mother resulted proximately from the injuries that she suffered in the accident and whether the plaintiffs were subject to a duty to provide a decent burial for her. If the mother's death resulted proximately from such injuries and if the plaintiffs were subject to a duty to provide a decent burial, the plaintiffs are entitled to recover from the defendant a reasonable amount expended for funeral expenses for the same reason that they are entitled to recover the expenses of medical treatment.

The allegation in the original complaint relating to the cause of death of plaintiffs' mother was as follows:

"That said injuries, which were the direct and proximate result of the Defendant's negligence as aforesaid, were so severe and caused the said LEE KONG SHEE so much mental anguish and physical pain that as a direct consequence thereof the said LEE KONG SHEE became so mentally depressed that she took her own life."

That allegation was insufficient to state a claim for relief. In *Scheffer* v. *Railroad Company*, 105 U. S. 249, the court held that the proximate cause of death by suicide of a person injured in an accident was such person's act of self-destruction and not the injuries suffered in the accident, although the suicide was induced by a state of mind which resulted from such injuries. The court stated: "The proximate cause of the death of Scheffer was his own act of self-destruction. It was * * * a new cause, and a sufficient cause of death."

The plaintiffs, therefore, amended the allegation to read as follows:

"That said injuries, which were the direct and proximate result of the Defendant's negligence as aforesaid, were so severe and caused the said LEE KONG SHEE so much mental anguish and physical pain that as a direct consequence thereof the said LEE KONG SHEE became delirious and bereft of reason and while in this condition took her own life, that at the time she took her own life, the said LEE KONG SHEE was being motivated by an uncontrollable impulse."

The amended allegation is based on the opinion in *Elliott* v. *Stone Baking Co.,* 49 Ga. App. 515, 176 S.E. 112, and dicta in *Koch* v. *Fox,* 75 N.Y.S. 913; *Daniels* v. *New York, N.H. & H.R. Co.,* 183 Mass. 393, 67 N.E. 424; *Brown* v. *American Steel & Wire Co.,* 43 Ind. App. 560, 88 N.E. 80; *Long* v. *Omaha & C. B. Street R. Co.,* 108 Neb. 342, 187 N.W. 930; and *Arsnow* v. *Red Top Cab Co.,* 159 Wash. 137, 292 P. 436. The significant portion of the amendment is the addition of the words, "that at the time she took her own life, the said LEE KONG SHEE was being motivated by an uncontrollable impulse."

The opinion in *Elliott* v. *Stone Baking Co.* states: "Where, as the proximate result of an injury upon his head caused by the negligence of another, the person injured becomes insane and bereft of reason, and while in this condition and as a result thereof he takes his own life, his act is not a voluntary one, but is involuntary, and is not an act which breaks the causal connection between the homicide and the act which caused the injury, and the latter act is the proximate cause of the homicide."

Of the cases mentioned above, only *Elliott* v. *Stone Baking Co.* holds that suicide does not sever the chain of causation. In all other cases, recovery was denied. However, in every case, there is a dictum which implies that the result would have been different if there was a showing that self-destruction resulted from an uncontrollable impulse accompanying a deranged state of mind.

In *Koch* v. *Fox*, denial of recovery was based on insufficiency of evidence to establish insanity. There a victim of defendant's negligence died from pneumonia induced by exposure to cold when he jumped into a river. The court stated: "If decedent jumped into the river, and at that time his reasoning faculties were so impaired that he was unable to understand the nature, effect, and consequence of the act, or if he was impelled thereto by an uncontrollable impulse, then, doubtless, he was an irresponsible agent, and insane." Upon review of the evidence, the court held that the jury was not justified in finding that the decedent was impelled into the water by an insane impulse. The basis for the finding appears in the following statement: "The evidence of the widow indicates that decedent was in a high state of mental excitement at the time he left the house, but, as there is no satisfactory evidence of previous insanity, that is insufficient to warrant a finding that he became and continued irresponsible. He may have fallen into the water through his own carelessness, and he may have jumped in through fright, or an error of judgment, or to avoid apprehended danger, or from other motives, while mentally responsible, within the rules stated; and in either case, manifestly, the appellant would not be liable for the consequences."

In *Daniels* v. *New York, N. H. & H. R. Co.*, the court, after stating that "the liability of a defendant for a death by suicide exists only when the death is the result of an uncontrollable impulse, or is accomplished in delirium or frenzy caused by the collision, and without conscious volition to produce death, having knowledge of the physical nature and consequences of the act," denied recovery because "the evidence tended to show that the deceased, with deliberate purpose, planned to take his own life; that he closed the door, and locked it, with a view to exclude others and prevent interruption; and that he then took

the napkin, and used it effectively to strangle himself."

In *Brown* v. *American Steel & Wire Co.*, the court stated the applicable law as follows: "From the cases bearing upon the subject now being considered the rule seems to be that an action under the statute may be maintained when the death is self-inflicted, only where it is the result of an uncontrollable influence, or is accomplished in delirium or frenzy, caused by the defendant's negligent act or omission, and without conscious volition of a purpose to take life; for then the act would be that of an irresponsible agent." It then affirmed a judgment in favor of the defendant because the evidence, instead of showing a want of conscious volition, strongly indicated that the defendant had a mind capable of conceiving a purpose of taking his life, as well as a knowledge of the means which would carry his purpose into effect.

*Long* v. *Omaha & C. B. Street R. Co.* and *Arsnow* v. *Red Top Cab Co.* are also cases in which suicide was the result of conscious volition and not of uncontrollable impulse. In the former, the court stated: "It appears, from the petition and the opening statement of plaintiff's counsel, that Mr. Long, with deliberate purpose, planned to take his own life; that he went to a hardware store, procured a shell to fit a shotgun which he had; that he carried said shell to his home, put it in the gun, and therewith shot and killed himself. All this points to his understanding of the physical nature and effect of his act, and to an intelligent and willful purpose to accomplish it. There is nothing to show that he was acting without volition, under an uncontrollable impulse, or that he did not understand the physical nature of his act." The pertinent portion of the opinion in the latter case is as follows: "Following the authorities above referred to, we hold that, from the undisputed testimony contained in the record before us, it must be determined as matter of law that plaintiff failed

to produce evidence which can support a finding of the jury in her favor to the effect that her deceased husband, at the time he killed himself, was laboring under such mental disability as can be denominated frenzy and was therefore entirely ignorant of the natural consequence of his act in pulling the trigger of his pistol while the muzzle was pressed to his head, or, on the other hand, that in so shooting himself he was moved by an uncontrollable impulse within the rule laid down by the authorities above referred to."

In the instant case, according to the amended allegation, the mother, when she committed suicide, was bereft of reason because of the mental anguish and physical pain caused by the injuries and was motivated by uncontrollable impulse. That is an allegation that her death resulted proximately from the act that caused the injuries. Whether she was, in fact, bereft of reason because of such mental anguish and physical pain and was motivated by uncontrollable impulse, when she committed suicide, is a matter of proof.

The final question that requires our consideration is whether the plaintiffs were subject to a duty to provide a decent burial for their mother.

There is a conflict of authorities as to whether a statutory duty of support includes the providing of burial. (*Phillips* v. *Home Undertakers,* 192 Okl. 597, 138 P. [2d] 550; *People* v. *New York Central R. Co.,* 392 Ill. 525, 64 N.E. [2d] 895; *In re Morizzo,* 139 N.E. [2d] 719)

*In re Morizzo* involved a Massachusetts statute, which provided: "The probate court, upon the application of the guardian or dependent parent of a mentally ill person * * * may authorize such guardian to apply towards the support of such dependent parent such portion of the estate of such mentally ill person not required for his own maintenance and support as it may order." The court construed the

word "support" as excluding funeral and burial expenses. It stated: "We must * * * give heed to the statute as drawn, and, regardless of personal preferences, we deem ourselves foreclosed from adopting the inclusive construction of such cases as Matter of Connolly's Estate, 88 Misc. 405, 150 N.Y.S. 559; Matter of Neville's Estate, 147 Misc. 171, 263 N.Y.S. 528, and In re Fitzwater's Guardianship, D.C.D.C., 69 F. Supp. 866."

We think that the construction of the word "support" in *In re Morizzo* is sound, and that the duty imposed by our statute upon adult children to support their indigent parent does not include the payment of funeral expenses. A provision for the burial of indigent persons is made in R.L.H. 1955, § 108-8.

That, however, does not mean that the plaintiffs were not obligated to provide a decent burial for their mother. If they had countenanced their mother to suffer the ignominy of a pauper's burial, they would have been subject to the censure of the outraged sentiment of the community. In providing a decent burial for their mother, they discharged more than a moral obligation.

A decent burial of the dead is dictated by considerations of public health, sentiment and respect for the dead. (*In re Kulyk's Estate*, 269 N.Y.S. 70) The duty of burial rests upon the persons who have the right of sepulture. In the absence of a spouse, the right of sepulture belongs to next of kin. (15 Am. Jur., *Dead Bodies*, § 10; 25 C.J.S., *Dead Bodies*, §§ 3, 5; *In re Kulyk's Estate, supra; Johnson* v. *Weed* [Tex. Civ. App.] 52 S.W. [2d] 917; *Koerber* v. *Patek*, 123 Wis. 453, 102 N.W. 40) In *Koerber* v. *Patek*, it is stated: "In absence of any surviving spouse, situations become subject to such complications that it probably is not wise, if proper, to attempt to declare general rules beyond the case actually presented. Suffice it to say that the duty and right of the parent toward the body of a

minor child dying a member of his household, or of the adult child toward a widowed parent, either a member of the child's family circle, or not a member of any other, seems too clear to warrant discussion."

We, therefore, hold that, as to funeral expenses also, the amended complaint sufficiently sets forth a claim upon which relief can be granted. It may be added that the recovery must be limited to a reasonable amount, considering the financial and social standing of the plaintiffs and their mother and the custom of the community. (*Seaton* v. *Commonwealth,* 149 Ky. 498, 149 S.W. 871; *In re Fitzwater's Guardianship,* 69 F. Supp. 866)

Our holding in this case is not contrary to *United States* v. *Standard Oil Co.,* 332 U.S. 301. There, the court refused to extend the rule established in master-servant, husband-wife, and parent-minor child relationships to government-soldier relationship. The denial was based principally on the ground that the question raised in the case concerned government fiscal policy, over which Congressional authority was paramount. It was also based on the court's conception of its limited function under the federal scheme. It stated: "We would not deny the Government's basic premise of the law's capacity for growth, or that it must include the creative work of judges. Soon all law would become antiquated strait jacket and then dead letter, if that power were lacking. And the judicial hand would stiffen in mortmain if it had no part in the work of creation. But in the federal scheme our part in that work, and the part of the other federal courts, outside the constitutional area is more modest than that of state courts, particularly in the freedom to create new common-law liabilities, as *Erie R. Co.* v. *Tompkins* itself witnesses."

Affirmed.

*Walter E. Bliss* (also on the briefs) for appellant.

*Earl S. Robinson* (*Fong, Miho, Choy & Chuck* on the brief) for appellees.