**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 10-2016**
_____

PEGGY RUSS; TAFFY GAUSE,

                    Plaintiffs - Appellees,

          v.

SID CAUSEY; ED MCMAHON; LACHLAN MACNEISH; DOUG PRICE; ERIC
BROWN; VERNON JORDAN; OHIO CASUALTY INSURANCE COMPANY;
BRANDON MATT JORDAN,

                    Defendants - Appellants.

_____

Appeal from the United States District Court for the Eastern
District of North Carolina, at New Bern.  Louise W. Flanagan,
Chief District Judge.  (7:09-cv-00017-FL)

_____

Argued:  October 26, 2011          Decided:  February 24, 2012

_____

Before KING, GREGORY, and WYNN, Circuit Judges.

_____

Affirmed by unpublished opinion.  Judge Gregory wrote the
majority opinion, in which Judge Wynn joined.  Judge King wrote
a dissenting opinion.

_____

**ARGUED:** James R. Morgan, Jr., WOMBLE CARLYLE SANDRIDGE & RICE,
PLLC, Winston-Salem, North Carolina, for Appellants.  Matthew
William Buckmiller, SHIPMAN & WRIGHT, LLP, Wilmington, North
Carolina, for Appellees.  **ON BRIEF:** Bradley O. Wood, Julie B.
Bradburn, WOMBLE CARLYLE SANDRIDGE & RICE, PLLC, Winston-Salem,
North Carolina, for Appellants.  Gary K. Shipman, SHIPMAN &
WRIGHT, LLP, Wilmington, North Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

In this case, Plaintiffs-Appellees Peggy Russ and Taffy Gause asserted a number of claims for relief against the former sheriff of New Hanover County, Sid Causey, and a number of his deputies in both their individual and official capacities. Their claims are premised on the defendants' conduct during the arrest of their son and brother, respectively, Gladwyn Taft Russ, III ("GT Russ III")[1] at the funeral of their husband and father, Gladwyn Taft Russ Jr. ("GT Russ Jr."). Specifically, Russ and Gause alleged (1) deprivation of their Fourth Amendment right to privacy in violation of 42 U.S.C. § 1983, (2) assault; (3) intentional infliction of emotional distress, (4) negligent infliction of emotional distress, (5) invasion of privacy, and (6) negligence. The defendants asserted various defenses, including governmental immunity and public officer's immunity, and moved for summary judgment. On August 5, 2010, the district court granted in part and denied in part the defendants' motion for summary judgment.

At issue on appeal is the district court's denial of defendants Eric Brown, B. Matt Jordan, and Doug Price's motion for summary judgment as to the Plaintiffs-Appellees' state law

---

[1] GT Russ III is not a party to this action.

claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence. In addition to allowing these claims to proceed against the defendants in their official capacities,[2] the district court allowed these claims to proceed against defendants Brown, Jordan, and Price in their individual capacities, denying defendants' affirmative defense of public officer's immunity. Defendants argue that the district court erred in concluding that Brown, Jordan, and Price were not entitled to public officer's immunity as a matter of law because Plaintiffs-Appellees failed to produce evidence that the deputies' actions were corrupt, malicious, or outside the scope of their official duties. We disagree. Because Plaintiffs-Appellees have put forth facts sufficient to create a genuine issue of material fact as to whether the officers acted with malice, an exception

---

[2] As to the claims against the defendants in their official capacities -- which are in fact claims against the New Hanover County Sheriff's Office -- the district court determined that the defendants were entitled to governmental immunity for damages in excess of $25,000 but that the Plaintiffs-Appellees could recover against the defendants in their official capacities for intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence up to $25,000. Because there is no proper basis for an interlocutory appeal of the claims against the defendants in their official capacities, we decline to exercise pendant appellate jurisdiction over the denial of summary judgment as to these claims.

4

to public officer's immunity, we affirm the denial of summary judgment.[3]

## I.

We begin our analysis with a reconstruction of the events that transpired and gave rise to these claims. We then examine the malice exception to public officer's immunity as applied to Plaintiffs-Appellees' claims.

## A.

On August 6, 2008, Glenda Sellars swore out a communicating-threats complaint against her husband, GT Russ III. A magistrate judge then issued a warrant for his arrest. Between August 8, 2008, and November 8, 2008, New Hanover County sheriff's deputies attempted to serve the warrant on GT Russ III at his mobile home located directly behind his parents' home. On each of these occasions, the deputies were unable to locate

---

[3] Thus, although the existence or absence of public officer's immunity may be established, where appropriate, as a matter of law, it is also true that in other cases this issue presents a question of fact to be resolved by the jury. See, e.g., Showalter v. North Carolina Dept. of Crime Control and Public Safety, 183 N.C. App. 132, 137, 643 S.E.2d 649, 652 (2007) (affirming denial of summary judgment because of open genuine issues of material fact in relation to officer's alleged malice precluded judgment as a matter of law on the basis of public officer's immunity).

GT Russ III or otherwise serve the warrant. Russ, the mother of GT Russ III, personally saw sheriff's deputies attempt to serve the warrant three times and informed the deputies that GT Russ III and Sellars had reconciled and were in Tennessee and that Sellars wanted to withdraw her complaint and drop the charges against GT Russ III.

On November 1, 2008, GT Russ III returned to North Carolina to be with his father, GT Russ Jr., whose health was deteriorating rapidly. Upon his return, GT Russ III did not attempt to surrender or turn himself in, nor did Russ inform anyone from the sheriff's office that GT Russ III was back in town. Plaintiffs-Appellees and GT Russ III appeared to believe -- incorrectly -- that the criminal complaint had been withdrawn, and they were otherwise preoccupied with the failing health of GT Russ Jr.

On November 8, 2008, the sheriff's office responded to a 9-1-1 call from GT Russ III's son, who stated that his father had slashed the tires and smashed the windows of his car and locked himself inside the house of Russ. Deputy Gonzalez, who had previously attempted to serve the arrest warrant on GT Russ III on a number of occasions, was the first to arrive on the scene. He verified the property damage and hoped to be able to serve the arrest warrant on GT Russ III. GT Russ III's son advised Deputy Gonzalez that GT Russ III was alone in the house

6

and that he had access to firearms.  Deputy Gonzalez radioed for backup.

After backup arrived, Deputy Gonzalez knocked on the door of the house and demanded that GT Russ III surrender to him, but GT Russ III refused to do so.  Plaintiffs-Appellees arrived on the scene but were directed to stay away from the house.  Russ gave the deputies the keys to her house so that they could enter and arrest GT Russ III.  Chief Deputy Sheriff Ed McMahon, who was second in command at the time (now Sheriff of New Hanover County), came to the house and spoke with GT Russ III over the telephone.  GT Russ III informed McMahon that he had returned to North Carolina to be with his father during surgery to be performed on November 10, 2008.  McMahon verified this with the Plaintiffs-Appellees and other family members, who also informed him that Sellars was not in North Carolina at the time.  After speaking with GT Russ III and Plaintiffs-Appellees, McMahon agreed to allow GT Russ III to turn himself in following his father's surgery.  The deputies left the scene and Russ, Gause, and GT Russ III went to GT Russ Jr.'s bedside at the hospital.

GT Russ III did not turn himself in on November 10, 2008. On that day, GT Russ Jr.'s condition worsened and on November 11, 2008, he died.  Deputy Gonzalez arrived at Russ's house on November 11, 2008, seeking to serve the warrant on GT Russ III. During his visit, Russ notified the deputy that her husband had

7

died and asked the deputy to notify Chief Deputy McMahon of that fact. On Wednesday, November 12, or Thursday, November 13, 2008, Russ and GT Russ III spoke with McMahon. During those conversations both notified him that GT Russ Jr. had died and that the family was busy making funeral arrangements for GT Russ Jr., who was to be buried with military honors. McMahon agreed to allow GT Russ III to turn himself in after his father's funeral. McMahon recounted his conversation with Russ where he admits agreeing to have GT Russ III turn himself in after the funeral:

> Q: Do you remember saying, "Okay, that is fine"? What did you say in response to that?
>
> A: I am sure I said, "Okay."

Consistent with that discussion, no efforts were made by the sheriff's office to serve the warrant or to contact GT Russ III about the warrant. Further, sheriff's deputies were specifically instructed not to go back to the house.

However, on November 13, 2008, McMahon and other senior law enforcement officers in the sheriff's office, worried that GT Russ III would not turn himself in, decided that their best chance to serve the arrest warrant would be to do so after the funeral service, which they were confident GT Russ III would attend. McMahon, after speaking with Causey, authorized the arrest of GT Russ III at some point after the funeral, to be

8

carried out as discretely and quickly as possible, but left the details of the arrest plan to Price. Price created the Incident Action Plan that details the arrest plan. Deputies Brown and Jordan were to wear plain clothes as they approached GT Russ III and arrest him in the parking lot of Andrews Valley Mortuary immediately following his father's funeral service. Price relayed this plan to McMahon.

The funeral of GT Russ Jr. was set for November 15, 2008, and it was intended to be a private ceremony. Plaintiffs-Appellees and GT Russ III went to the mortuary early in the morning together to ensure everything was being set up appropriately for the service. GT Russ III drove his truck to the funeral service at Andrews Valley Mortuary. The service began at 1:00 or 2:00 p.m. with family members and friends paying their respects to GT Russ Jr. and the Russ family.

Prior to the funeral service, Brown and Jordan, who were wearing civilian suits and ties, drove to an adjacent animal hospital to observe the funeral home and then parked their unmarked car in an empty parking space in the funeral home's parking lot once all of the funeral attendees had gone inside. No one from the sheriff's office had notified Andrews Valley Mortuary that they would attempt to serve a warrant at the funeral service.

9

After the service concluded, Plaintiffs-Appellees exited the funeral home through the front entrance and went into the limousine. The parties differ as to exactly what happened after GT Russ III exited the funeral home at the conclusion of the service, although their versions of events do overlap. Accepting Plaintiffs-Appellees' version as true where there are differences, the arrest occurred as follows: GT Russ III was the pallbearer for his father's casket and the casket went out the side door of the mortuary where the hearse was parked under the carport. Ronald Simmons was also a pallbearer on the left side with GT Russ III and John Hoy from Andrews Valley Mortuary was assisting the pallbearers in the transportation of the casket. As GT Russ III was putting his father's casket into the hearse, two gentlemen in suits and ties approached. Price had given permission for Deputies Brown and Jordan to approach the funeral at this time. Ronald Simmons was an arm's length away from GT Russ III and initially thought that the men were friends or family that had attended the funeral.

Brown then violently grabbed GT Russ III and threw him up against the hearse. Deputy Brown never identified himself as law enforcement nor did he inform GT Russ III that he was under arrest. GT Russ III broke loose from Brown, not knowing who he was, and Hoy and Simmons thought they were criminals attacking GT Russ III.

10

As Plaintiffs-Appellees were seated in the limo they heard a loud noise from GT Russ III being thrown against the hearse and a lot of screaming. They went over to the commotion surrounding the hearse. During the scuffle with GT Russ III, Brown's back-up firearm had become dislodged and had fallen to the pavement. In an attempt to control the crowd, defendant Jordan drew his Taser, which to Plaintiffs-Appellees appeared to be a firearm. Neither defendant Jordan nor defendant Brown had identified themselves at this point. When asked by Russ and Gause who they were and what they were doing, the deputies refused to identify themselves and threatened to shoot bystanders. Plaintiffs-Appellees contend that during this time the deputies were waving their Tasers wildly at the attendees and pointing them at Plaintiffs-Appellees faces as they stood a few feet away. Brown then employed his Taser against GT Russ III in order to subdue him. Plaintiffs-Appellees allege that during all this time neither Brown nor Jordan identified themselves and that they and others at the funeral feared for their lives.

At some point during the arrest of GT Russ III, Brown and Jordan radioed for assistance. Price and another deputy, who had been maintaining positions around the funeral home to prevent escape, responded and arrived at the scene at about the time GT Russ III was placed in handcuffs. After seeing GT Russ

11

III handcuffed, attendees understood that these individuals were law enforcement officers. The attendees wanted answers from Price as to why this happened, to which he responded that he would take everyone to jail if they did not calm down. It is further alleged that Price was rude during this discussion, further exacerbating the situation. Eventually, Brown and Jordan transported GT Russ III to New Hanover County Detention Center.

It took Andrews Valley Mortuary approximately thirty minutes to restore order to the service and many people in attendance did not continue to the cemetery for the burial. The Plaintiffs-Appellees went to the cemetery in shock. The next day, or shortly thereafter, Russ and her family requested a meeting with McMahon where McMahon apologized and indicated that there was a miscommunication and that the arrest was supposed to have occurred after the burial. The law enforcement officers involved in the arrest were orally reprimanded by Sheriff Causey.

The events at the funeral were "the most horrible thing" Russ has ever gone through and neither she nor Gause have received closure for their husband and father's death. Consistent with Plaintiffs-Appellees' experience, funeral attendees were mortified and shocked by what happened.

B.

Brown, Jordan, and Price are public officers shielded from personal liability under North Carolina's doctrine of public officer's immunity unless it is alleged and proved that their actions, or lack thereof, were of a nature that pierces the cloak of this immunity.[4] Accordingly, in order to sustain a personal or individual capacity suit against Brown, Jordan, and Price for the state law claims, Plaintiffs-Appellees "must initially make a prima facie showing that the defendant-official's tortuous conduct falls within one of the immunity exceptions." Trantham v. Lane, 488 S.E.2d 625, 627 (N.C.App. 1997).

As a preliminary matter, defendants assert that Plaintiffs-Appellees' claims for negligent infliction of emotional distress and negligence are, by their very definition, claims for

_____

[4] It is well established that federal courts, when interpreting North Carolina law, "must rule as the North Carolina courts would, treating decisions of the Supreme Court of North Carolina as binding . . . ." Iodice v. United States, 289 F.3d 270, 275 (4th Cir. 2002). Consistent with this deference to state law, holdings by the North Carolina Court of Appeals on a point of North Carolina law are "not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." West v. Amer. Tel. & Tel. Co., 311 U.S. 223, 237 (1940); see also Comm'r of Internal Revenue v. Bosch, 387 U.S. 456, 465 (1967); Sanderson v. Rice, 777 F. 2d 902, 905 (4th Cir. 1985), cert. den., 475 U.S. 1027 (1986).

negligence and because public officers may not be held personally liable for negligence, the officers are entitled to public officer's immunity as to these claims.

In support of this proposition, defendants' cite to this Court's holding in Shaw v. Stroud that a "negligent infliction of emotional distress claim, by its very definition, necessarily alleges only negligence. Therefore, [the defendant state trooper] [wa]s absolutely immune [individually] from any negligent infliction of emotional distress claim under North Carolina law." Shaw v. Stroud, 13 F.3d 791, 803 (4th Cir. 1994) (rejecting plaintiff's claim that gross negligence is sufficient to pierce public official immunity). In Shaw, however, the plaintiff was arguing that gross negligence was sufficient to pierce an officer's immunity. There were no allegations of malicious or corrupt actions or actions beyond the scope of the officer's duties, exceptions to public officer's immunity that this Court in Shaw explicitly acknowledged. Id. ("While intentional, malicious, or corrupt actions may pierce an officer's immunity, the North Carolina Supreme Court has never allowed a showing of gross negligence to suffice to pierce an officer's immunity . . . ."). Further, the North Carolina Court of Appeals has explicitly held that negligence actions can be maintained if, in addition to the elements of a negligence claim, plaintiffs allege and prove that the officer's actions

14

were corrupt or malicious or beyond the scope of the officer's duties:

> While we recognize that generally, claims of negligence can not be maintained against public officials in their individual capacity, these actions may be maintained, if plaintiffs bring forth evidence sufficient to 'pierce the cloak of official immunity.'

Prior v. Pruett, 550 S.E.2d 166, 171 (N.C.App. 2001) (emphasis added); see also, Schlossberg v. Goins, 540 S.E.2d 49, 56 (N.C. App. 2000) (quoting Slade v. Vernon, 429 S.E.2d 744, 747 (N.C. App. 1993)) ("Under the public officers' immunity doctrine, 'a public official is [generally] immune from personal liability for mere negligence in the performance of his duties, but he is not shielded from liability if his alleged actions were corrupt or malicious or if he acted outside and beyond the scope of his duties'."). It is not the elements of the claim that determine whether a public official is entitled to public officer's immunity. Rather, it is whether the facts alleged are sufficient to pierce the cloak of immunity, so as to strip the official of that immunity and allow plaintiffs to sue the official "as if the suit had been brought against 'any private individual.'" Id.

Under North Carolina law, it is clearly established that "where a defendant performs discretionary acts as part of his or her official or governmental duties, to sustain a suit for personal or individual liability, a plaintiff must allege and

15

prove that the defendant's acts were malicious or corrupt." Schlossberg v. Goins, 540 S.E.2d 49 (N.C.App. 2000) (citing Wilkins v. Burton, 16 S.E.2d 406, 407 (N.C. 1941)). Here, it is undisputed that Brown, Jordan, and Price were on duty during the afternoon of November 15. "Moreover the decisions made by [the officers] in attempting to restrain and arrest [an individual] were discretionary decisions made during the course of performing their official duties as public officers." Schlossberg, 540 S.E.2d at 540. Because the deputies were engaged in discretionary acts as part of their official duties and Plaintiffs-Appellees do not allege that the deputies' actions were corrupt, the only relevant question for purposes of the public officer's immunity analysis is whether Plaintiffs-Appellees have put forth sufficient evidence of malice to survive summary judgment.

The district court found that the plaintiffs "put forward sufficient evidence of extreme and outrageous conduct and reckless indifference" to support a showing of malice and overcome the defense of public officer's immunity. It is presumed that a public official in the performance of his official duties "acts fairly, impartially, and in good faith and in the exercise of sound judgment or discretion, for the purpose of promoting the public good and protecting the public interest." Greene v. Town of Valdese, 291 S.E.2d 630, 632 (N.C.

16

1982) (citations omitted). "Thus, to overcome the presumption of good faith in favor of a public official, the burden is on the plaintiff to offer a sufficient forecast of evidence to establish . . . the public officials' actions were malicious. . . ." Crocker v. Griffin, No. COA09-1000, 2010 WL 1961258 at *6 (N.C.App. May 18, 2010).

Acts of malice are one exception to the doctrine of public officer's immunity, a doctrine where "public officials cannot be held individually liable for damages caused by mere negligence in the performance of their governmental or discretionary duties." Meyer v. Walls, 489 S.E.2d 880, 889 (N.C. 1997). "A defendant acts with malice when [] he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and [] which he intends to be prejudicial or injurious to another." In re Grad v. Kaasa, 321 S.E.2d 888, 890 (N.C. 1984). The Supreme Court of North Carolina explained that "[a]n act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." Id. at 890-91 (quoting Givens v. Sellers, 159 S.E.2d 530, 535 (N.C. 1968)). When the definition of "wanton" is grafted into the definition of "malice," Grad establishes a three pronged framework providing that malice, for the purposes of piercing the cloak of public officer's immunity, may be demonstrated by conduct: (1) "when done needlessly, manifesting

17

a reckless indifference to the rights of others," 321 S.E.2d at 890-91; (2) "which a [person] of reasonable intelligence would know to be contrary to [their] duty," id. at 90 and (3) "which [is] intend[ed] to be prejudicial or injurious to another." Id.

Regarding the first prong, we agree with the district court that Plaintiffs-Appellees put forth sufficient evidence that the officers needlessly engaged in conduct, manifesting a reckless indifference to the rights of others. Our conclusion is based on the Plaintiffs-Appellees' evidence of the following conduct of Brown, Jordan, and Price: Brown and Jordan grabbed GT Russ III during his father's funeral while GT Russ III was putting the casket into the hearse; the deputies failed to identify themselves as police officers; Jordan threatened to use his Taser on elderly and particularly emotional bystanders attending the funeral; Price planned the arrest and threatened to arrest other funeral attendees who sought explanation; and the officers and their supervisors were brutish and bullying toward grieving family and friends.

Further, Plaintiffs-Appellees have presented evidence sufficient to show that the actions of Brown, Jordan, and Price were actions an officer "of reasonable intelligence would know to be contrary to his duty." Grad, 321 S.E.2d at 890. Brown and Jordan passed a Basic Law Enforcement Training ("BLET") course and exam, which provides the "minimum standards" for law

18

enforcement officers in the state of North Carolina. The BLET course discussed the proper procedure for arresting individuals. The policies are listed as follows: "(1) Identify Self as an officer, (2) Inform suspect he or she is 'under arrest' and (3) State reason(s) for the arrest." This evidence -- when viewed in the light most favorable to Plaintiffs-Appellees -- makes clear that defendants failed to follow even one of those basic rules of law enforcement before effectuating the arrest of GT Russ III. In addition, N.C. Gen. Stat § 15A-401(c) supports the BLET tenets for making an arrest:

(2) Upon making an arrest, a law-enforcement officer must:

    a. Identify himself as a law-enforcement officer unless his identity is otherwise apparent

    b. Inform the arrested person that he is under arrest, and

    c. As promptly as is reasonable under the circumstances, inform the arrested person of the cause of the arrest, unless the cause appears to be evident.

N.C. Gen. Stat § 15A-401(c).

Contrary to the dissent's assertion, the relevant "duty" of the officers -- rather than a duty to refrain from arresting Mr. Russ at the funeral home, post at 28 -- was the duty not to engage in extreme and outrageous conduct intended to cause, and in fact causing, severe emotional distress to Plaintiffs-Appellees. In this regard, and thus in respect of the second prong of malice, it is relevant that the officers' alleged

19

conduct occurred during a funeral. The Supreme Court of North Carolina has long recognized that a funeral is a solemn event that creates certain rights in mourners and requires that special care be taken by third parties. Floyd v. Atl. Coast Line Ry. Co., 83 S.E. 12, 12-13 (N.C. 1914) ("There is a duty imposed by the universal feelings of mankind to be discharged by someone toward the dead, a duty, and we may also say a right, to protect from violation, and a duty on the part of others to abstain from violation."); cf. Parker v. Quinn-McGowen Co., 138 S.E.2d 214 (N.C. 1964) (noting that next of kin has a quasi-property right in a deceased body for its burial and there arises out of that right an emotional interest which should be protected and which others have a duty not to injure intentionally or negligently); Lamm v. Shingleton, 55 S.E.2d 810, 813 (N.C. 1949) ("The tenderest feelings of the human heart center around the remains of the dead.").

Other states, and other courts, have similarly recognized the rights and protections afforded by law to funerals and burials. See, e.g., Holland v. Metalious, 198 A.2d 654, 656 (N.H. 1964) ("The right to 'decent' burial is one which has long been recognized at common law, and in which the public as well as the individual has an interest"); King v. Elrod, 268 S.W.2d 103, 105 (Tenn. 1953) ("[T]he right to decent burial is well guarded by the law, and relatives of a deceased are entitled to

20

insist upon legal protection for any disturbance or violation of this right." (citation omitted)); Koerber v. Patek, 102 N.W. 40, 43 (Wis. 1905) ("We can imagine no clearer or dearer right in the gamut of civil liberty and security than to bury our dead in peace and unobstructed. . . . [N]one where the law need less hesitate to impose upon a willful violator responsibility for the uttermost consequences of his act."); cf. Snyder v. Phelps __ U.S. __, __, 131 S.Ct. 1207, 1227-1228 (2011) (Alito, J., dissenting) (explaining that "the emotional well-being of bereaved relatives is particularly vulnerable" at funerals because intrusions "may permanently stain their memories of the final moments before a loved one is laid to rest," and, as a result, "funerals are unique events at which special protection against emotional assaults is in order"); Nat'l Archives & Records Admin. v. Favish, 541 U.S. 157, 167-70 (2004) (noting that "[b]urial rites or their counterparts have been respected in almost all civilizations from time immemorial," and further noting that funerals "are a sign of the respect a society shows for the deceased and for the surviving family members").[5]

---

[5] Indeed, a number of states have gone so far as to create a special category within the common law tort of negligent infliction of emotional distress for interference with proper burials. See Restatement (Third) Torts § 46 (Tentative Draft No. 5 2007).

21

As to the third prong of malice under Grad, Plaintiffs-Appellees must produce at least some evidence that the defendants "intend[ed] to be prejudicial or injurious to another." Kaasa, 321 S.E.2d at 890; see Hawkins v. State of North Carolina, 453 S.E.2d 233, 242 (N.C.App. 1995). North Carolina courts have found summary judgment inappropriate where there is a genuine issue of fact as to an officer's state of mind when engaging in allegedly tortious conduct.[6] See, e.g., Showalter v. N.C. Dept. of Crime Control & Public Safety, 643 S.E.2d 649 (N.C.App. 2007) (finding summary judgment inappropriate on public officer's immunity where trooper stated he did not act maliciously but where trooper's actions in macing plaintiff and dragging him from car during traffic stop created a genuine issue of fact as to whether actions were done with malice); Thompson v. Town of Dallas, 543 S.E.2d 901, 905

---

[6] Although allegations of "reckless indifference" in the complaint may be insufficient to survive a motion to dismiss, see, e.g., Jones v. Kearns, 462 S.E.2d 245, 248 (N.C. App. 1995), evidence of conduct manifesting a reckless indifference to the rights of others may in some cases be "substantial evidence" from which a jury may properly infer specific intent to injure. See, e.g., State v. Barlowe, 337 N.C. 371, 379, 446 S.E.2d 352, 357 (1994) ("Intent must normally be proved by circumstantial evidence, and an intent to kill may be inferred from the nature of the assault, the manner in which it was made, the conduct of the parties, and other relevant circumstances." (quotation marks and alterations omitted)).

(N.C.App. 2001) (finding that genuine issue of material fact as to whether officer acted with malice in arresting motorist precluded summary judgment on punitive damages claim).

Arguably, the very act of selecting the moment a grieving son places his father's casket into a hearse to execute his arrest in front of his family and innocent third party attendees demonstrates an intent to injure him, his family, and anyone else at the funeral grieving the decedent's death. This is especially true where, as here, there were numerous opportunities to serve the warrant elsewhere, the sheriff's office had previously promised not to take any action until after the funeral, and the officers did not believe there was any threat necessitating an immediate arrest. As Plaintiffs-Appellees allege, the conduct of Brown, Jordan, and Price is sufficient to create a genuine issue of fact material to the issue of public officer's immunity, particularly as to the officers' intent in creating and executing the arrest plan.

II.

For the reasons given above, we affirm the district court's denial of summary judgment.

AFFIRMED

23

KING, Circuit Judge, dissenting:

With the utmost respect for my distinguished colleagues in the majority, I dissent from their decision to permit the plaintiffs to attempt to hold the arresting deputies and their immediate supervisor individually liable at trial for the botched arrest at the funeral home. No reasonable jury could conclude from the record on summary judgment that these defendants acted with the requisite malice such that their entitlement to the immunity routinely afforded public officials under North Carolina law ought to be abrogated. Perhaps more importantly, and no matter the deputies' subjective intentions toward GT Russ III ("Mr. Russ") in taking him into custody, there is simply no evidentiary basis to deduce that they meant any harm whatsoever to the plaintiffs.

The majority's analysis correctly focuses on the question of malice; there is no legitimate allegation that, in arresting Mr. Russ, the deputies were corruptly influenced or undertook an act outside their job description. See Grad v. Kaasa, 321 S.E.2d 888, 890 (N.C. 1984) ("As long as a public officer lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption, he is protected from liability."). There is likewise no indication that, in performing their jobs, the deputies lacked probable

24

cause to arrest Mr. Russ or that they were without legal entitlement to park at the funeral home and traverse its grounds.

The execution of the arrest warrant was indisputably tactless and clumsy. In denying the deputies summary judgment on the individual-capacity claims, the district court went farther, observing that the plaintiffs "put forward sufficient evidence of extreme and outrageous conduct and reckless indifference." Russ v. Causey, 732 F. Supp. 2d 589, 613 (E.D.N.C. 2010). Even if one concurs in the court's characterization, the difficulty with its ruling is that neither "extreme and outrageous conduct" nor "reckless indifference" equates to malice under North Carolina law.

"Extreme and outrageous conduct" is an element of a claim for intentional infliction of emotional distress, but the term merely describes the necessary predicate act. See Johnson v. Antioch United Holy Church, Inc., 714 S.E.2d 806, 811 (N.C. Ct. App. 2011) (reciting essential elements of claim as "(1) extreme and outrageous conduct by the defendant (2) which is intended to and does in fact cause (3) severe emotional distress" (citation and internal quotation marks omitted)). The conduct alone is not actionable unless accompanied by a particular mental state, i.e., the intent to inflict a cognizable psychic injury upon the plaintiff, with the result that such injury consequently occurs.

25

"Reckless indifference," on the other hand, does describe a mental state — one that is potentially actionable in many contexts — but one that falls short of the rigorous threshold for malice. Indeed, the North Carolina courts have squarely held that "[a] plaintiff may not satisfy this burden [of showing malice or corruption] through allegations of mere reckless indifference." Schlossberg v. Goins, 540 S.E.2d 49, 56 (N.C. Ct. App. 2000). A public official "acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." Grad, 321 S.E.2d at 890 (citation omitted). A "wanton" act is one "done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." Id. at 891 (citation omitted).

A considered reconciliation of the above excerpts from Grad reveals that a wanton act, even one tending less toward wicked and more toward needless (from which a general state of reckless indifference might be inferred), is, standing alone, insufficient to establish malice. Such an act must also be objectively contrary to the officer's duty and target a specific

26

person for detriment.[1]   Thus, although the deputies may have callously and boorishly invaded the solemnity of the funeral proceedings, it does not follow that their zeal translated into malice.  It is also not determinative that the deputies may have contravened the prescribed arrest procedure by neglecting to identify themselves prior to engaging Mr. Russ.  The majority elevates this technical breach to the violation of a statutory duty, see ante at 17-18, but even assuming the correctness of the majority's position, it was a violation without meaning in this case.

The fracas did not occur because the deputies failed to identify themselves; it occurred because Mr. Russ, without cause, vigorously resisted arrest.  The record conclusively establishes that Mr. Russ is, without question, a scofflaw who,

---

[1] The majority errs in overemphasizing the initial component of the Grad framework, making the unjustified logical leap that "[w]hen the definition of 'wanton' is grafted into the definition of 'malice,'" ante at 16, the incorporation within wantonness of an inchoate aura of reckless indifference is determinative of malice if a police officer is found to have breached any duty (not necessarily one related to the alleged injury) and intends to harm or injure any person (not necessarily the plaintiff).  See id. at 17-22.  The majority's approach, in effect, squarely contravenes the admonition in Schlossberg that the conduct of police officers in the field be evaluated under the rigorous causal and targeting requirements accompanying the malice standard, and not under the more amorphous, less accommodating reckless indifference standard.

over the years, has made a habit of evading capture.[2]  In this particular instance, Mr. Russ was well aware that the Sheriff's Office possessed a warrant for his arrest.  Five days before the funeral, Mr. Russ barricaded himself inside his parent's house to keep from being arrested, and, two days after that, broke a promise to turn himself in.  There can be no credible contention that Mr. Russ did not understand perfectly well who was accosting him at the funeral home, notwithstanding that he may not have been personally acquainted with the arresting deputies.  See N.C. Gen. Stat. § 15A-401(c)(2) (disposing of identification requirement if arresting officer's "identity is otherwise apparent").[3]  Furthermore, under the circumstances present here,

---

[2] For example, Deputy Mario Gonzalez filed an uncontested declaration that "Mr. Russ . . . was known within the New Hanover County Sheriff's Office to be an elusive individual who could be very difficult to locate and apprehend . . . .  On repeated occasions, he had promised me over the telephone that he would turn himself in, but he invariably failed to do so." J.A. 70 (citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties to this appeal).

[3] The plaintiffs' own witness, Ronald Simmons, submitted an affidavit that Mr. Russ, prior to being subdued, acknowledged that the men engaging him were police officers by stating that "I had permission to turn myself in."  J.A. 833.  That the bystanders were momentarily at sea concerning the deputies' identity is immaterial, as it was solely Mr. Russ who was responsible for escalating the encounter.  Mr. Simmons's particular expression of bewilderment:  "I thought what was going on was some kind of [M]afioso type hit," id., does not
(Continued)

28

whatever duty the deputies might have short-circuited by virtue of their subterfuge was countermanded by their overriding duty to take Mr. Russ into custody before he could leave the jurisdiction. See State v. Harvey, 187 S.E.2d 706, 712 (N.C. 1972) ("When a warrant . . . is placed in the hands of an officer for execution, it is his duty to carry out its demands without delay, and he incurs no liability for its proper execution, however disastrous may be the effect on the person against whom it is issued."). That duty the deputies fulfilled, albeit inelegantly.[4]

---

exactly inspire confidence in the plaintiffs' contention that Mr. Russ lacked culpability for the incident.

[4] Though the majority plainly hangs its hat on the alleged violation of the deputies' duty to identify themselves, it conflates that supposed misstep with several other actions it considers "brutish and bullying" or otherwise objectionable, ante at 17, to declare that the officers were bound to observe a considerably broader "duty not to engage in extreme and outrageous conduct." Id. at 18. Such a general mandate might constitute useful public policy in the realm of everyday tort law. It is of limited utility, however, to guide the actions of police officers, who routinely fulfill their duties by lawfully engaging in conduct that would be considered extreme if done by an ordinary citizen. Tellingly, none of the cases cited by the majority as establishing a special legal status for funerals and burials, see ante at 19-20, remotely involved police conduct, and none have discussed the need for balancing society's interest in the solemnity of death rituals with the countervailing interest in the effective execution of criminal justice.

Perhaps more importantly for the purposes of our analysis, any injury or prejudice that the deputies may have intended by virtue of their actions was directed solely at Mr. Russ. There is no indication in the record of any animosity or ill-will between the deputies and the plaintiffs. See J.A. 379, 596 (documenting plaintiffs' deposition admissions that defendants bore them no personal animus). To the contrary, all indications are that the Sheriff's Office extended the plaintiffs every consideration and courtesy throughout the days leading up to the incident and beyond. See id. at 76 (memorializing Deputy Gonzalez's condolences to Peggy Russ on her husband's death and forgoing confrontation concerning her son's whereabouts); id. at 145 (setting forth Chief Deputy McMahon's accession to Peggy Russ's pleas to stay away from residence during mourning period); id. at 369 (acknowledging McMahon's apology to plaintiffs).

The majority pays little heed to the targeting requirement, suggesting that the deputies' timing of Mr. Russ's arrest arguably "demonstrates an intent to injure him, his family, and anyone else at the funeral grieving the decedent's death." Ante at 22. The majority's supposition finds no support in North Carolina law, and it in fact appears to be an attempt to engraft the negligence concept of foreseeability (which usually circumscribes the contours of duty and damages) onto a very

30

different type of claim, the successful prosecution of which has heretofore required a specific malevolent or uncaring intent on the part of the defendant.[5] This unwarranted expansion of the universe of potential plaintiffs is also in contravention of the state's statutory scheme regarding the award of punitive damages in cases where the defendant has acted maliciously. See N.C. Gen. Stat. § 1D-15(a)(2). In such instances, the plaintiff must prove malice "toward the claimant that activated or incited the defendant to perform the act or undertake the conduct that resulted in harm to the claimant." Id. § 1D-5(5) (emphasis

---

[5] The majority cites Prior v. Pruett, 550 S.E.2d 166 (N.C. Ct. App. 2001), for the uncontroversial proposition, echoed in Schlossberg, that "generally, claims of negligence can not be maintained against public officials in their individual capacity, [but] these actions may be maintained if plaintiffs bring forth evidence sufficient to pierce the cloak of official immunity." Id. at 171 (citation and internal quotation marks omitted). It was probably no accident that the court in Prior distinguished between "claims of negligence" and "these actions." An action arises out of a specific occurrence or set of circumstances that, under the applicable law, may engender myriad claims supporting the imposition of liability. When it is demonstrated that a defendant public official has acted culpably enough to pierce the cloak of immunity, the plaintiff no longer has a claim for ordinary negligence; instead, the claim is for an intentional tort (assault and battery in Schlossberg, and here, infliction of emotional distress) or some functional equivalent. Indeed, the denial of summary judgment to the police defendants in Prior was based on the court's determination that genuine issues of material fact remained with respect to the officers' allegedly wanton conduct and gross negligence. See id. at 171-72, 174.

31

added).  Here, the record is clear that, when the commotion began, the plaintiffs were in a limousine waiting for the procession to the gravesite to commence.  That they had to exit their vehicle and walk around the building to see what was happening belies the conclusion that the deputies intended them any harm at all.

I would hold that the district court erred in withholding public officials immunity from the arresting deputies and their supervisor, and I would reverse the denial of summary judgment on that basis.  I would remand with instructions to grant summary judgment to all defendants as to the entirety of the plaintiffs' action, including the negligence claims, concluding that as distasteful as the entire episode undoubtedly was, the defendants owed no cognizable legal duty to the plaintiffs to refrain from arresting Mr. Russ at the funeral home.  Because my good friends in the majority disagree and will allow this matter to proceed to trial, I respectfully dissent.